(874 P.2d 680)
Nos. 69,705
70,398

In the Interest of BABY BOY N., and In the Matter of the Adoption of BABY BOY N.
Petition for review denied 255 Kan. 1001 (1994).

Opinion filed May 13, 1994.

*Stuart R. Collier*, of Arn, Mullins, Unruh, Kuhn & Wilson, of Wichita, for appellant natural father.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Swartz, of Wichita, for appellee Catholic Social Services.

Before ROYSE, P.J., LEWIS and PIERRON, JJ.

LEWIS, J.: D.G. and T.M.N. are the natural father and mother of Baby Boy N., who was born November 7, 1992. D.G. and T.M.N. have never been married. This litigation concerns the adoption of Baby Boy N. with the consent of his mother and over the objections of his father. D.G. is the appellant. The appellee is Catholic Social Services (CSS), which represents the interests of T.M.N. and of the adoptive parents. We affirm in part, vacate in part, and remand.

From the time D.G. was informed that T.M.N. was pregnant, the parties disagreed over the future of their unborn child. T.M.N. wanted to place the child for adoption, and D.G. wanted to keep the child. That disagreement has culminated in this appeal.

In this case, some specific dates are important. On March 2, 1992, T.M.N. advised D.G. that she was pregnant with his child. On April 20, 1992, D.G. terminated his relationship with T.M.N. It is undisputed that, during the six months preceding the birth of Baby Boy N., D.G. provided T.M.N. with no support, financial or otherwise. The justification offered by D.G. for his nonsupport will be dealt with later in this opinion.

D.G. refused to give his consent for an adoption. Accordingly, a petition was filed to sever his parental rights under K.S.A. 1993 Supp. 59-2136(h). The trial court, after hearing the evidence, concluded that D.G. had failed to support T.M.N. in the six

months preceding the birth of Baby Boy N. and that he had abandoned her after learning of the pregnancy. The trial court then terminated the parental rights of D.G. under the statute. D.G. appeals from that order of termination.

After D.G. had filed his notice of appeal from the order terminating his parental rights, the trial court continued the litigation and heard evidence on the adoption. The trial court entered an adoption decree without the consent of D.G., in reliance upon the termination of his parental rights by the earlier order. D.G. filed a second notice of appeal from the adoption decree. These two appeals have been consolidated.

D.G. raises several issues, and further facts will be developed as necessary in dealing with those issues.

## STANDING OF NATURAL MOTHER AND ADOPTION AGENCY

D.G. contends that neither T.M.N. nor CSS had standing to file the petition for termination of his parental rights.

The original petition to terminate D.G.'s parental rights was filed by CSS. On a later date, an amended petition to terminate parental rights was filed by CSS and T.M.N. K.S.A. 1993 Supp. 59-2136(e) provides: "The petition may be filed by the mother, the petitioner for adoption, the person or agency having custody of the child or the agency to which the child has been or is to be relinquished."

D.G.'s argument on this issue is based on two relinquishment forms signed by T.M.N. The first form attempted to relinquish the parental rights of T.M.N. to CSS. This form was filed the day Baby Boy N. was born. CSS never accepted that relinquishment in writing. T.M.N. then signed a second relinquishment form. This relinquishment was conditional to the extent that it only was to become effective if D.G.'s parental rights were terminated. If his parental rights were not terminated, the relinquishment was null and void and T.M.N. retained all parental rights. CSS did accept this relinquishment in writing but did so conditionally on termination of the rights of D.G.

D.G. argues that the first form signed by T.M.N. did not give CSS standing because it was not accepted in writing. He then argues that the second relinquishment was ineffective because,

by this point, T.M.N. had no rights left to relinquish. He suggests that the first relinquishment forfeited all of T.M.N.'s parental rights and she had no rights to relinquish by the time the second form was signed. CSS, he says, gained no standing by the second relinquishment because it was a nullity and conditionally accepted. We disagree with D.G.'s argument.

K.S.A. 1993 Supp. 59-2124 reads in pertinent part as follows:

"(a) Any parent or parents or person *in loco parentis* may relinquish a child to an agency, and if the agency accepts the relinquishment in writing, the agency shall stand *in loco parentis* to the child and shall have and possess over the child all rights of a parent or legal guardian, including the power to place the child for adoption and give consent thereto.

"(b) All relinquishments to an agency under K.S.A. 59-2111 through 59-2143, and amendments thereto, shall be in writing, in substantial conformity with the form for relinquishment contained in the appendix of forms following K.S.A. 59-2143, and amendments thereto, and shall be executed by: (1) Both parents of the child; (2) one parent, if the other parent is deceased or the other parent's relinquishment is found unnecessary under K.S.A. 59-2136, and amendments thereto; or (3) a person *in loco parentis*."

As we read the statute, neither relinquishment was effective. The first relinquishment signed by T.M.N. was never accepted in writing as required by 59-2124(a). The second relinquishment was only conditionally accepted by CSS, and we find nothing in the statute authorizing a conditional acceptance. If neither relinquishment was effective, T.M.N. was left in the same position as if she had never signed them. T.M.N. had standing to sign the second amended petition. Her signature is the only one required.

K.S.A. 1993 Supp. 59-2124 is a statute which authorizes divestiture of parents' rights, and it must be strictly construed in favor of maintaining those rights. *Wilson v. Kansas Children's Home*, 159 Kan. 325, 329-30, 154 P.2d 137 (1944). *Wilson* dealt with G.S. 1935, 38-113, a statute similar to the one now under consideration. That statute authorized relinquishment of parental rights if the form was executed by the parent and accepted by the agency. In *Wilson*, the mother signed the relinquishment form, but there was no evidence that custody or control of the child was ever accepted by the adoption home or agency. The mother filed a writ of habeas corpus, seeking custody of her

children, and it was granted since her relinquishment of those children had never been accepted as required by law.

In the instant matter, neither relinquishment executed by T.M.N. was properly accepted and neither document divested the mother of her natural rights.

K.S.A. 1993 Supp. 59-2136(e) provides: "The petition may be filed by the mother, the petitioner for adoption, the person or agency having custody of the child *or the agency to which the child has been or is to be relinquished.*" (Emphasis added.) It is clear under these facts that CSS was an agency to which the child had been or was to be relinquished and, as such, it also had standing to file the second petition for termination of parental rights under 59-2136(e).

We conclude that D.G.'s argument on standing is without merit.

## CONSTITUTIONALITY OF K.S.A. 1993 SUPP. 59-2136(h)(4) AND (5)

D.G. asserts, for the first time on appeal, that K.S.A. 1993 Supp. 59-2136(h)(4) and (5) are unconstitutional. The subsection in question reads as follows:

"(h) When a father or alleged father appears and asserts parental rights, the court shall determine parentage, if necessary pursuant to the Kansas parentage act. If a father desires but is financially unable to employ an attorney, the court shall appoint an attorney for the father. Thereafter, the court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

(1) The father abandoned or neglected the child after having knowledge of the child's birth;

(2) the father is unfit as a parent or incapable of giving consent;

(3) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

(4) *the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;*

(5) *the father abandoned the mother after having knowledge of the pregnancy;*

(6) the birth of the child was the result of rape of the mother; or

(7) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition." (Emphasis added.)

The emphasized portions of the statute are those under attack.

D.G. bases his argument on the fact that the trial court did not find that he was an unfit parent and still terminated his parental rights. He submits that the termination of his parental rights without finding him unfit is unconstitutional and violates the parental fitness doctrine announced by the Kansas Supreme Court in *Sheppard v. Sheppard*, 230 Kan. 146, 630 P.2d 1121 (1981), and very recently affirmed by that court in *In re Guardianship of Williams*, 254 Kan. 814, 869 P.2d 661 (1994).

This issue was not raised to the trial court. It is raised before this court for the first time on appeal. "Where constitutional grounds for reversal of a judgment are asserted for the first time on appeal, they are not properly before the appellate court for review." *In re D.D.P., Jr.*, 249 Kan. 529, Syl. ¶ 5, 819 P.2d 1212 (1991). There is an exception to the rule we have just quoted. When the constitutionality of a statute is at issue, it may be addressed for the first time on appeal if addressing that issue is necessary to determine the merits of the action or where the issues cannot be intelligently decided without doing so. *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 575, 796 P.2d 1060 (1990). We conclude that we cannot intelligently decide the merits of this action without dealing with the claim that the portion of the statute cited above is unconstitutional.

The parental fitness doctrine to which D.G. refers has been the law of this state for some period of time. However, it was in *Sheppard* that the rule was truly defined and applied. The *Sheppard* case was a dispute between the mother of a minor child and her parents. The maternal grandparents were granted custody of the minor child. The mother filed a motion to change custody, and, in the ensuing litigation, the trial court determined that it was in the best interests of the child that he remain with the maternal grandparents. The mother appealed. The Supreme Court reversed and, in so doing, said:

"It is clear under our decisions and those of the United States Supreme Court that a natural parent's right to the custody of his or her children is a fundamental right which may not be disturbed by the State or by third persons, absent a showing that the natural parent is unfit. As we noted in *In re Cooper*, 230 Kan. 57, 631 P.2d 632 (1981), a parent's right to the custody, care, and control of his or her child is a fundamental liberty right protected by the Fourteenth Amendment of the Constitution of the United States.

"The statute under [K.S.A. 1980 Supp. 60-1610(b)(2)] takes away that right. Fitness of a parent is no longer the criterion. If the trial court determines that the best interests of the child will be served by placing it with third persons, the court may do so. The parent need not consent, and he or she may be perfectly fit, willing, and able to care for and raise the child. No exceptional circumstances need exist.

"The exact objective of the legislature is not clear. The act provides an expeditious method of awarding custody, despite the existence of fit parents, to persons who have had temporary custody of the child with the consent of a divorced parent. It reaches only the children of divorced parents, not those of separated or unwed parents. The statute does not appear necessary in order to further the State's interest in the protection of children, for we have the juvenile code provisions to protect neglected children, and provisions in the civil code to provide for changes in custody and support, and for the removal of children from unfit parents. See K.S.A. 1980 Supp. 38-824, K.S.A. 1980 Supp. 38-1301 et seq., and K.S.A. 1980 Supp. 60-1610(a) and (b)(1).

"Catherine Sheppard appeared before the trial court opposing the motion of her parents and seeking to retain custody of her son. The trial court made a specific finding, upon conflicting evidence which we need not detail here, that Catherine Sheppard was not an unfit parent. Under the authorities cited above, she has a fundamental right, protected by the Due Process Clause of the Fourteenth Amendment, to the custody of her child, as opposed to all third parties. She cannot be denied that right for the sole reason that a court determines and concludes that someone other than a natural parent might do a better job of raising the child, thus furthering his 'best interests.' " *Sheppard*, 230 Kan. at 152-53.

The court then went on to state its holding:

"What we hold here is simply this: that a parent who is not found to be unfit, has a fundamental right, protected by the Due Process Clause of the United States Constitution, to the care, custody and control of his or her child, and that the right of such a parent to custody of the child cannot be taken away in favor of a third person, absent a finding of unfitness on the part of the parent. We hold that K.S.A. 1980 Supp. 60-1610(b)(2), which destroys that fundamental right, is violative of the Due Process Clause and therefore unconstitutional." 230 Kan. at 154.

This "parental fitness doctrine" was most recently reaffirmed by our Supreme Court in *In re Guardianship of Williams*, 254 Kan. 814. In the process, the court overruled a Court of Appeals decision in *In re Marriage of Criqui*, 14 Kan. App. 2d 672, 798 P.2d 69 (1990), in which we allowed the best interests of the child to be considered in a custody dispute between a natural parent and the child's grandparents.

At first glance, the argument made by D.G. appears to be compelling. The *Williams* and *Sheppard* decisions rather emphatically state that a parent must be proven unfit before being deprived of custody in a dispute with a nonparent. Do *Williams* and *Sheppard* control this decision? Must the parental preference doctrine be employed in every instance involving disputes between natural parents and third parties? The answer to these questions is a qualified "No." The parental preference doctrine is generally employed in cases where the issue is one of custody between a parent and a nonparent in a divorce or domestic relations setting. The courts have applied other rules in adoption proceedings where the issue is whether the consent of a natural parent is required. The rules which apply to cases of that nature are generally statutory in origin. The constitutionality of those rules has been dealt with by the Supreme Courts of the United States and of the State of Kansas. In *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972), the court held that an Illinois statute, which automatically made illegitimate children wards of the State upon the mother's death, violated both the equal protection and due process clauses of the United States Constitution. Factually, *Stanley* was a case in which the unwed father had lived with and supported the children all of their lives. Under those facts, the court held that the father was entitled to notice and a hearing to determine his fitness as a parent before destroying his custodial relationship with his children.

In *Quilloin v. Walcott*, 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549, *reh. denied* 435 U.S. 918 (1978), the court examined a Georgia statute which allowed the adoption of an illegitimate child over the natural father's objection. The facts in that case indicated that the stepfather had petitioned to adopt his wife's 12-year-old illegitimate child. The natural father of that child had never had custody of the child and had assumed only minimal responsibilities for the welfare and support of the child. When the natural father learned of the pending adoption, he sought to prevent it. He also sought visitation rights and filed a petition for legitimation. The Supreme Court held that a "best interests of the child" hearing, which requires less proof than a "fitness" hearing, satisfied the natural father's due process rights under the facts.

In *Caban v. Mohammed*, 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760 (1979), the United States Supreme Court held a New York statute unconstitutional. The statute, similar to a statute in Kansas, required the consent of an unwed mother for the adoption of her child but not that of the unwed father. The statute was stricken as an unconstitutional violation of the gender-based prohibition against denial of equal protection of the law.

Again, the facts of *Caban* are instructive. Caban had lived with Maria out of wedlock for several years. During the period of time the two cohabited, two children were born. Caban was the acknowledged father and contributed to the support of these children over the years. After he and Maria separated and she married Mohammed, Caban continued to maintain close contact with the children. Throughout the years, Caban continuously maintained a close, familial relationship with the children. Maria's new husband attempted to adopt the children under a statute which required her consent but not the consent of the unwed father. In a five-to-four decision, the Court held the New York statute unconstitutional. However, the language in the opinion appears to limit the operation of the decision. The court in *Caban* indicated that a different result might be reached in a situation where an infant was involved as opposed to an older child. The court also intimated that a different result might be reached in a case where, factually, the natural father had never come forward to participate in the rearing of the child. *Caban*, it appeared, was limited to the facts shown.

The Kansas Supreme Court first dealt with these issues in *In re Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982). In that case, the natural father of an illegitimate child challenged the constitutionality of K.S.A. 59-2102(2) (repealed L. 1990, ch. 145, § 38) for the reason that the statute required the consent of the mother of an illegitimate child for adoption but not the consent of the unwed father. The Supreme Court, in a carefully reasoned opinion, held that under the facts shown the statute did not violate the constitution.

"With the foregoing principles in mind it is obvious that K.S.A. 59-2102(2) is not unconstitutional in all adoption cases involving an unwed father. The extremes involving application of the statute would be (1) where the father is unknown or the child is the result of rape, it is obvious that consent

would not be required; and (2) in a case such as *Caban* where the children were several years old, the father had established a close-knit familial relationship with the children and their mother and had supported and nurtured them for years, consent would be necessary. Is there a middle ground in which K.S.A. 59-2102(2) is constitutional based upon the facts of the case? We think so. In *Caban* the Supreme Court indicated that the adoption of an illegitimate infant or one whose father had failed to come forth and provide support would probably not require consent so long as the safeguards of *Stanley* and *Quilloin* were observed. . . .

· "Appellants contend that the appellees should have first prevailed upon the mother to bring relinquishment proceedings under K.S.A. 38-113a. Such proceedings are not a part of the adoption statutes and while they have no application to the facts before us, the statute is indicative of the legislative intent involving illegitimate children and reveals certain factual situations which are pertinent to our discussion. The statute provides that the mother of an illegitimate child may relinquish her child for adoption pursuant to K.S.A. 38[-113a] without the consent of the father when:

'(1) The father abandoned or neglected the child after having knowledge of the child's birth;

'(2). the father is unfit as a parent;

'(3) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

'(4) *the father failed without reasonable cause to provide support for the mother during the six months prior to the child's birth*;

'(5) *the father abandoned the mother after having knowledge of the pregnancy*; or

'(6) the birth of the illegitimate child was the result of rape of the mother.'

"While we do not consider such factual situations to be exclusive, *we believe they are descriptive of situations where, applying the requirements of* Caban, *the adoption of an illegitimate child without the father's consent pursuant to K.S.A. 59-2102(2) would not be unconstitutional.*" 231 Kan. at 223-24. (Emphasis added.)

We recognize that the portion of the opinion quoted above is, in all probability, nothing more than dicta. K.S.A. 38-113a (Ensley 1981) (repealed L. 1985, ch. 114, § 30) was not an issue in *In re Adoption of Baby Boy L.* Despite that fact, we find the reasoning of the Supreme Court logical and persuasive. There is every reason for protecting the rights of a father to children, illegitimate or not, whom he has reared, loved, and supported. This is the true parental right which we protect, and it involves not only the individual rights of the father but the broader concept of family, which is also entitled to protection. By the same token, where the father's "right" is purely biological and there has been

no family formed, no bonding, no support, and no love, that right seems to be obviously less deserving of support. Those instances specified under K.S.A. 38-113a and K.S.A. 1993 Supp. 59-2136(h)(1)-(7) in which consent may be declared unnecessary are examples of situations in which the right of a natural father is little more than biological. We hold that the Constitution does not prohibit dispensing with a father's consent when the factual situations shown in 59-2136(h)(1)-(7) are shown to exist and the father's due process rights to litigate those issues has also been protected.

The extent to which a true parent-child relationship affects this issue is further shown in *Lehr v. Robertson,* 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983). The natural father in that case argued that his due process rights were violated because he was not given notice of the adoption proceeding. New York law required that notice be given only to those putative fathers who have filed their names with a putative father registry; the natural father had not done so. It was undisputed that he had never had any significant custodial, personal, or financial relationship with his child, and he did not seek to establish a legal tie with her until she was two years old.

The Supreme Court of the United States upheld the New York statute as constitutional, indicating:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child' [citation omitted], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he 'act[s] as a father toward his children.' [Citation omitted.] *But the mere existence of a biological link does not merit equivalent constitutional protection.* . . .

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." (Emphasis added.) 463 U.S. at 261-62.

The decisions in *Stanley, Quilloin, Caban, Baby Boy L.,* and *Lehr* indicate that the degree of protection afforded parental rights

under the Due Process Clause depends upon the extent and nature of the parent-child relationship. In the instant matter, it is undisputed that the father did not support the mother for six months prior to the birth of the child and that there is no developed parent-child relationship between D.G. and Baby Boy N. This case does not concern termination of a fully developed parent-child relationship. Under those circumstances, we conclude that K.S.A. 1993 Supp. 59-2136(h)(4) and (5) are not unconstitutional under the facts shown.

We next turn to the question of whether the statute in question provides due process protection of a father's rights. We conclude that it does. K.S.A. 1993 Supp. 59-2136(h) provides the father with notice and an opportunity to be heard and appointed counsel to represent him if necessary. In addition, his consent will be required unless one of the seven situations in K.S.A. 1993 Supp. 59-2136(h) is proven by clear and convincing evidence. We believe that where a trial court finds that a father's reasonable efforts to provide for his child's welfare failed because of interference by the mother, adoption agency, or adoptive parents, the statute should not operate to terminate his parental rights.

There can be no equal protection claim. K.S.A. 1993 Supp. 59-2136, by its own terms, applies to the mother as well as to the father where possible.

What about the parental preference issue? Can that doctrine, as enunciated in *Sheppard* and *Williams*, be reconciled to the adoption statutes which permit a natural parent's consent to be dispensed with for reasons other than unfitness? We believe that it can. We would limit *Sheppard* and *Williams* to those cases where a statutory scheme such as 59-2136(h) does not apply. As construed by the courts, statutes such as 59-2136(h) incorporate the parental preference doctrine by their protection of due process rights and the "clear and convincing" burden of proof required to terminate the rights of natural parents. In cases such as this, the rights of a natural parent are properly protected, and the "parental preference" doctrine is preempted.

The parental preference doctrine is nothing more than a rule of law designed to protect the constitutional due process rights of a natural parent to the custody of his or her children. The protections incorporated within K.S.A. 1993 Supp. 59-2136(h)

provide the same, if not better, protection of a parent's constitutional rights. For this reason, the parental preference doctrine need not be employed where the same or similar protections are provided by statute. It is true that, in this case, D.G. was not found to be unfit, but his rights were terminated for reasons equally constitutional and under circumstances equally protective of his constitutional rights as the parental preference doctrine. For these reasons, we conclude that K.S.A. 1993 Supp. 59-2136(h) is not an unconstitutional intrusion upon, or abrogation of, the parental preference doctrine.

## DID THE TRIAL COURT ERR IN TERMINATING D.G.'S PARENTAL RIGHTS?

D.G. next argues that the trial court erred in finding that: (a) he failed without reasonable cause to provide support for T.M.N. during the six months prior to the child's birth; and (b) he abandoned T.M.N. after having knowledge of her pregnancy.

Our standard of review on this issue is whether the trial court's findings were supported by substantial competent evidence:

"When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the duty of the appellate court extends only to a search of the record to determine whether substantial competent evidence exists to support the findings. An appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below."

"In a determination under K.S.A. 1986 Supp. 59-2102(a)(3) of whether consent of a parent to an adoption is unnecessary for failure to assume parental duties, the best interests of the child is not a controlling factor in the decision."

"In making a determination pursuant to K.S.A. 1986 Supp. 59-2102(a)(3), the fitness of the nonconsenting parent is not a controlling factor as it would be under proceedings pursuant to K.S.A. 38-1581 *et seq.*"

"Generally speaking, adoption statutes are strictly construed in favor of maintaining the rights of natural parents in those cases where it is claimed that, by reason of a parent's failure to fulfill parental obligations as prescribed by statute, consent to the adoption is not required."

"In making a determination in an adoption proceeding of whether a nonconsenting parent has failed to assume his or her parental duties for two consecutive years, all the surrounding circumstances must be considered." *In re Adoption of F.A.R.*, 242 Kan. 231, Syl. ¶¶ 2-6, 747 P.2d 145 (1987).

In *In re Adoption of Baby Boy S.*, 16 Kan. App. 2d 311, 313, 822 P.2d 76 (1991), we held that the determination of whether a father had failed without reasonable cause to provide support for the mother during the six months prior to the child's birth was

"analogous to cases where the trial court must determine if a parent has failed or refused to assume the duties of a parent for two consecutive years prior to an adoption pursuant to K.S.A. 1990 Supp. 59-2136(h)(7) (repealing and replacing K.S.A. 1989 Supp. 59-2102[a][3]). The tests and rules applicable in those instances are equally applicable when a trial court must determine whether a father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth."

When determining whether a nonconsenting father has failed without reasonable cause to provide support for the mother during the last six months of pregnancy, all the relevant surrounding circumstances must be considered. *In re Adoption of Baby Boy S.*, 16 Kan. App. 2d at 312. These circumstances may include the father's conduct more than six months before the birth of the baby. 16 Kan. App. 2d 311, Syl. ¶ 3.

In the instant matter, it is undisputed that D.G. provided no support, financial or otherwise, to T.M.N. in the six months before she gave birth. Moreover, T.M.N. testified that she had no contact with D.G. between June 3, 1992, and November 7, 1992. We note that D.G. disputes T.M.N.'s testimony in this regard and testified that he spoke to her twice during that time frame.

We need not concern ourselves in this case with what constitutes support. That was adequately defined in *In re Adoption of McMullen*, 236 Kan. 348, 691 P.2d 17 (1984). Here, however, no support was provided. The only issue which the trial court was required to determine was whether D.G. failed to provide the support without reasonable cause.

D.G. argues that his failure to provide support should be excused on several grounds. First, T.M.N. wrote him a letter in which she stated she would disappear if he did not consent to the adoption. He argues that, after he received that letter, he feared that if he contacted T.M.N., she would disappear with his child. Despite this testimony, D.G. also testified that he went

immediately to her home after he received the letter and discussed the matter with her extensively. He also testified that T.M.N. asked him to seek counseling with her, but that he declined to do so. The trial court found it significant that T.M.N. never indicated that she would refuse D.G.'s support. Indeed, the letter sought only his consent to the adoption. We conclude that substantial competent evidence supports the trial court's decision that this letter did not reasonably excuse D.G.'s failure to provide support.

D.G. next argues that he called the Wichita Legal Services to ask what legal steps could be taken to prevent the adoption of the child. He testified that an employee there told him that there was nothing he could do until the child was born. He seeks to justify his failure to provide support on the basis of the advice given him by the Wichita Legal Services. The trial court rejected this excuse. The court held that the mere fact that D.G. could do nothing to prevent the adoption of the child prior to its birth did not constitute a reasonable excuse for his failure to provide support. We hold that this finding is supported by substantial competent evidence.

Finally, D.G. argues that he was not required to provide support to T.M.N. because she did not require any support. It is possible that the mother's needs and requirements are a relevant circumstance in determining whether a natural father acted reasonably in failing to provide her with support. In this case, however, the argument is irrelevant. D.G. cannot rely on this argument because substantial competent evidence indicates that he never inquired about the needs of T.M.N. nor offered her any support in the six months prior to her giving birth. It seems obvious to us that since he did not know whether she needed support, he cannot now claim that this was a reasonable cause of his failure to provide support.

Finally, we turn to the trial court's conclusion that D.G. abandoned T.M.N. after having knowledge of her pregnancy. We have pointed out that, according to T.M.N.'s testimony, she had no contact at all with D.G. for a period of five months preceding the birth of the child. Although this testimony was controverted by D.G., the trial court, as the finder of fact, was required to determine which version it believed. The trial court chose to

believe the testimony of T.M.N. This testimony provides substantial competent evidence that D.G. terminated his relationship with T.M.N. and withdrew his support from her after learning of her pregnancy. In our judgment, this evidence is sufficient to support a finding that D.G. abandoned T.M.N.

We hold that the trial court's decision to terminate the parental rights of D.G. for the reasons stated in this opinion was supported by substantial competent evidence.

## DID THE TRIAL COURT HAVE JURISDICTION TO ENTER THE DECREE OF ADOPTION?

D.G., finally, argues that the trial court had no jurisdiction to enter the adoption decree in this case after D.G. had appealed the order terminating his parental rights. We agree with D.G. and vacate the adoption decree entered in the instant matter.

Adoption is a procedure governed by the probate code as set out in Chapter 59 of the Kansas Statutes Annotated. As such, it is subject to the provisions of K.S.A. 59-2407, which provides:

"An appeal from an order admitting a will to probate shall not suspend the operation of the order until the appeal is determined, but no distribution to heirs, devisees, or legatees shall be made pending the appeal. *In all other cases the appeal shall suspend the operation of the order, judgment, decree, or decision appealed from until the appeal is determined or the judge hearing such appeal shall otherwise order.*" (Emphasis added.)

The provisions of K.S.A. 59-2407 are clear and unambiguous. This case does not involve appeal of an order admitting a will to probate. By virtue of 59-2407, operation of the order terminating D.G.'s parental rights was suspended as soon as he filed a notice of appeal from that order. The effect of that suspension was to leave the situation the same as if the order terminating parental rights had never been entered. Thus, the adoption decree was entered without D.G.'s consent and without an operative decision dispensing with his consent. The trial court was without jurisdiction to grant the adoption without either the consent of D.G. or an operative order determining that his consent was not necessary. See *In re Adoption of Harrington*, 228 Kan. 636, 639-40, 620 P.2d 315 (1980).

Under the circumstances, we have no choice but to vacate the decree of adoption and remand the matter for a new hearing on

the issue of adoption. We have determined, in this opinion, that the consent of D.G. to the adoption is not required by affirming the decision terminating his parental rights. D.G., as a consequence, will not be a factor in proceedings to finalize this adoption after our mandate has been filed in the instant matter. We would, therefore, expect that adoption proceedings which take place after the mandate is spread of record to be somewhat more perfunctory than the ones which give rise to this appeal.

We realize that setting aside an adoption decree is an extreme decision and is fraught with possible consequences; however, we have no choice but to do so in the instant matter. We suggest that the legislature might very well consider whether to alter the impact of K.S.A. 59-2407 on proceedings of this nature. However, the impact a reversal of an order terminating parental rights will have on a decree of adoption granted after that order was appealed from must be considered.

Judgment terminating parental rights of natural father is affirmed, judgment of adoption is vacated, and the matter is remanded for a new trial on the issue of adoption.