(62 P.3d 708)

No. 88,584

In the Matter of C.L.A., a Minor Child.

Opinion filed January 17, 2003.

T. *Lynn Ward* and *Robert W. Coykendall,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant.

*Richard A. Macias,* of Law Office of Richard A. Macias, of Wichita, for appellee.

Before GERNON, P.J., GREEN and JOHNSON, JJ.

GERNON, J.: J.A. appeals the termination of his parental rights in an agency adoption proceeding pursuant to K.S.A. 59-2136.

J.A. and M.J. are the natural parents of C.L.A. J.A. and M.J. met in 1997 in Yelm, Washington, when M.J. was homeless and 6 or 7 months pregnant with someone else's child. M.J. put that baby up for adoption.

Over the course of their relationship from 1997 until October 2000, J.A. and M.J. lived together in a car, a 16-foot travel trailer, a mobile home, miscellaneous apartments, and a house. They also lived with friends for several months. C.L.A. was born in July 1998, while they lived in an apartment in Tumwater, Washington. Throughout the relationship, J.A. worked to support the family and M.J. stayed home.

In the spring of 2000, J.A. and M.J. decided to move the family to Kansas with a friend, Debbie Cox. After moving to Kansas, J.A., M.J., and C.L.A. lived with Debbie Cox and her mother, Barbara Cox, for several months before renting a house of their own. During that time, J.A. worked to support M.J. and C.L.A., while M.J. stayed home with C.L.A. In addition to supporting the family, J.A. cared for C.L.A. in the evenings.

M.J. claims that J.A. was abusive and possessive during their relationship. She moved out of their house in October 2000, taking C.L.A. with her. M.J. moved in with Mark, a man she had recently met at a bar. She did not tell J.A. that she was leaving and did not tell him where she and C.L.A. were staying for over a week.

In November 2000, after M.J. and C.L.A. had moved out, J.A. decided to go to Alaska to earn money working on fishing boats. J.A. told M.J. that he could earn a lot of money quickly and that he would return. J.A. headed to Alaska on December 2, 2000, leaving all of the household belongings and the truck with M.J. At that time, M.J. was still living with Mark. She had gotten a job with health benefits and had enrolled C.L.A. in daycare.

In the middle of December 2000, Mark kicked M.J. and C.L.A. out of his home. M.J. moved into a motel with C.L.A. and her sister, Tammy, until the end of December 2000. M.J., C.L.A., and Tammy then moved in with Brian. Brian kicked M.J. out of his home on January 21, 2001. M.J. quit her job 2 days before Brian kicked her out.

Upon being kicked out of Brian's home, M.J. placed C.L.A. for adoption and began living in her truck. M.J. parked the truck outside her favorite bar, slept all day, and stayed up all night in the bar. After a couple weeks of living in her truck, M.J. moved in with Jeremy in early February 2001. She stayed with Jeremy until February 14, 2001, and then rode along with Mike, a truck driver, to California for 3 weeks.

J.A. was unable to find employment in Alaska and returned to Kansas on December 26 or 27, 2000. He attempted to contact M.J. at Mark's house the day he returned. After another unsuccessful attempt to contact M.J., J.A. went to Kansas City, seeking employment as a truck driver with Swift Transportation (Swift).

On January 8, 2001, J.A. began a 3-week truck driving school in Fort Scott, Kansas. On January 31, 2001, J.A. began full-time employment with Swift and enrolled C.L.A. in the company health benefit plan.

On February 21, 2001, J.A.'s father contacted J.A. while he was on the road for Swift and told J.A. that M.J. had placed C.L.A. for adoption. On February 22, 2001, J.A.'s father contacted the adoption agency and told them that he had contacted J.A. On that same day, the adoption agency filed a petition under K.S.A. 59-2136(e) to terminate J.A.'s parental rights.

M.J. testified during the first 2 days of hearings. However, on the third hearing date, M.J. was unable to attend court due to illness, so the court continued the matter. M.J. also failed to attend the next two scheduled hearings, which were also continued. Because J.A. had not finished his cross-examination of M.J. and she had not appeared at three hearings, J.A. moved to exclude M.J.'s testimony and dismiss the termination petition. The court initially granted J.A.'s motion but reinstated the petition after the adoption

agency filed a motion to reinstate and secured M.J.'s appearance to testify.

After 11 days of evidentiary hearings, spread out over 4 months, the trial court terminated J.A.'s parental rights, finding that J.A. was unfit and had abandoned C.L.A. J.A. appeals, arguing that the trial court erroneously terminated his parental rights.

The fundamental principle in the termination of parental rights, whether through child in need of care or adoption proceedings, is the natural parent's right to be a parent. *In re Application to Adopt H.B.S.C.*, 28 Kan. App. 2d 191, 195, 12 P.3d 916 (2000). Both the United States Supreme Court and the Kansas Supreme Court have recognized the relationship between parent and child to be constitutionally protected. *Quilloin v. Walcott*, 434 U.S. 246, 255, 54 L. Ed. 2d 511, 98 S. Ct. 549, *reh. denied* 435 U.S. 918 (1978); *In re Guardianship of Williams*, 254 Kan. 814, 819, 869 P.2d 661 (1994).

The right to be the legal parent of a child is a right that cannot be abrogated except under compelling circumstances. *In re Adoption of K.J.B.*, 265 Kan. 90, 101, 959 P.2d 853 (1998). "Indeed, other than the right to personal freedom, there may be no private right valued more highly or protected more zealously by the courts than the right of a parent to the custody and control of his or her children." *In re J.L.*, 20 Kan. App. 2d 665, 671, 891 P.2d 1125, *rev. denied* 257 Kan. 1092 (1995).

The protections incorporated into K.S.A. 59-2136 protect a parent's constitutional rights, preempting the parental preference doctrine. *In re Baby Boy N.*, 19 Kan. App. 2d 574, 585-86, 874 P.2d 680, *rev. denied* 255 Kan. 1001, *cert. denied* 513 U.S. 1018 (1994). Consequently, adoption statutes are to be strictly construed in favor of maintaining the rights of the natural parent. *In re Adoption of K.J.B.*, 265 Kan. at 95.

When reviewing a trial court's decision to terminate parental rights under K.S.A. 59-2136(h), an appellate court must determine whether the trial court's findings are supported by substantial competent evidence. The appellate court cannot reweigh the evidence or pass on the credibility of the witnesses, but must consider the evidence in the light most favorable to the party prevailing below.

Substantial evidence possesses both relevance and substance and furnishes a substantial basis of fact from which issues can reasonably be resolved. *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 666-67, 29 P.3d 466 (2001), *aff'd* 273 Kan. 71, 41 P.3d 287 (2002).

K.S.A. 59-2136(h) provides:

"When a father or alleged father appears and asserts parental rights, the court shall determine parentage, if necessary, pursuant to the Kansas parentage act. If a father desires but is financially unable to employ an attorney, the court shall appoint an attorney for the father. Thereafter, the court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

(1) The father abandoned or neglected the child after having knowledge of the child's birth;

(2) the father is unfit as a parent or incapable of giving consent;

(3) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

(4) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

(5) the father abandoned the mother after having knowledge of the pregnancy;

(6) the birth of the child was the result of rape of the mother; or

(7) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition."

The trial court terminated J.A.'s parental rights to C.L.A. pursuant to K.S.A. 59-2136(h)(2), by finding J.A. to be unfit, and K.S.A. 59-2136(h)(1), by finding that J.A. abandoned C.L.A.

The analysis of this case begins with the trial court's determination that J.A. is unfit. The probate code does not include a definition of unfit. However, Kansas case law provides some guidance regarding the definition of unfit by incorporating the factors set forth in the Kansas Code for the Care of Children into the application of the probate code. *In re Adoption of A.P.*, 26 Kan. App. 2d 210, 215, 982 P.2d 985, *rev. denied* 268 Kan. 886 (1999).

K.S.A. 2001 Supp. 38-1583(a) provides that parental rights may be terminated when the court finds by clear and convincing evidence that the parent is unfit because of conduct or a condition that renders the parent unable to properly care for the child and the conduct or condition is unlikely to change in the foreseeable

future. K.S.A. 2001 Supp. 38-1583(b) and (c) establish a nonexhaustive list of factors for the court to consider in determining if a parent's conduct or condition warrants termination. Those include:

"(b)(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental and emotional needs of the child;

(2) conduct toward a child of a physically, emotionally or sexually cruel or abusive nature;

(3) excessive use of intoxicating liquors or narcotic or dangerous drugs;

(4) physical, mental or emotional neglect of the child;

(5) conviction of a felony and imprisonment;

(6) unexplained injury or death of another child or stepchild of the parent;

(7) reasonable efforts by appropriate public or private child caring agencies have been unable to rehabilitate the family; and

(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child.

. . . .

"(c)(1) Failure to assure care of the child in the parental home when able to do so;

(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home; and

(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay."

In this case, the trial court determined that J.A. had been emotionally abusive to C.L.A. because he physically abused M.J. and that J.A. had failed to adjust his circumstances or his conduct to meet C.L.A.'s needs. See K.S.A. 2001 Supp. 38-1583(b)(2) and (4). The trial court's finding that J.A. is unfit because he emotionally abused C.L.A. is not supported by substantial competent evidence in the record.

The representative of the private adoption agency testified that the agency requested a medical examination of C.L.A., and he was in good physical health when he was relinquished by his mother. Tammy, C.L.A.'s maternal aunt, testified that C.L.A. was a healthy, well-cared-for, happy child.

Other witnesses who lived with C.L.A. testified that C.L.A. had no emotional problems. Debbie Cox lived with C.L.A. and his par-

ents from approximately March or April 2000 until August 2000. She testified on cross-examination that C.L.A. did not express any unusual emotional behavior and was not afraid of J.A. Barbara Cox also lived with C.L.A. and his parents from May 2000 until August 2000. She testified under cross-examination that she had never seen C.L.A. have an abnormal emotional response.

Even M.J., C.L.A.'s mother, did not indicate that C.L.A. was affected by the alleged abuse. J.A.'s attorney asked M.J. if C.L.A. was "exhibiting any signs of any problems of any kind." M.J. responded that "[C.L.A.] just had a temper, but what two-year-old doesn't." M.J. then testified that C.L.A. went through a lot when she left J.A. M.J. also testified that it would be bad for C.L.A. to be taken from J.A. because it was important for C.L.A. to have a relationship with J.A. She further testified that C.L.A. suffered during the period after she moved out when J.A. was not involved in C.L.A.'s life.

It is also important to note that K.S.A. 2001 Supp. 38-1583(b)(2), which was relied upon by the trial judge in determining J.A. to be unfit, is limited to situations in which the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2001 Supp. 38-1583(a). In this case, there is no substantial competent evidence to support a finding that J.A. would continue to abuse M.J. J.A.'s relationship with M.J. is over. J.A. and M.J. did not see each other from the end of November 2000 until the first court hearing in May 2001. In the meantime, J.A. has married another woman. J.A.'s new wife testified that J.A. has not been abusive to her or her children in any manner.

The trial court cited *In re Adoption of A.P.*, 26 Kan. App. 2d 210, in support of its conclusion that J.A. was unfit due to the abuse of C.L.A.'s mother. *In re Adoption of A.P.* can be distinguished on its facts. The trial court in *In re Adoption of A.P.* based its decision that the father was unfit on the following 5 factors:

"First, T.P. engaged in conduct toward A.P. that was of an emotionally abusive nature, including shouting, outrage, intimidating outbursts, and outbursts of temper. Second, T.P. was convicted of first-degree murder and would be incarcerated for a minimum of 25 years. Third, the murder was of A.P.'s natural mother. Fourth, T.P. had a propensity toward, and had engaged in, numerous incidents

and outbursts of violence and displays of outrage and aggression against the natural mother. Last, T.P. failed to adjust his circumstance or conduct to meet the needs of his child." *In re Adoption of A.P.*, 26 Kan. App. 2d at 216.

Here, there is no substantial competent evidence that J.A. engaged in conduct toward C.L.A. that was of an emotionally abusive nature, including shouting, outrage, intimidating outbursts, and outbursts of temper toward C.L.A. J.A. has not been convicted of any crimes or sentenced to prison for the period of C.L.A.'s minority as the father was in *In re J.A.* Likewise, J.A. has not failed to adjust his circumstances to meet C.L.A.'s needs.

Next, we must analyze the trial court's finding that J.A. abandoned C.L.A. pursuant to K.S.A. 59-2136(h)(1).

Black's Law Dictionary defines abandonment to mean "[t]he act of leaving a spouse or child willfully and without an intent to return." Black's Law Dictionary 2 (7th ed. 1999). There is no substantial competent evidence that J.A. left without an intent to return. Although the time frame that J.A. planned to be gone was disputed, there is no evidence that he never intended to return. M.J. testified that J.A. told her that he would return and that he would contact her when he did. Accordingly, the trial court erred when it determined that J.A. had abandoned C.L.A.

Because the trial court's findings are not supported by substantial competent evidence, the termination of J.A.'s parental rights is reversed. C.L.A. shall be returned to J.A.'s legal custody.

Reversed.