NOT DESIGNATED FOR PUBLICATION

No. 118,426

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Application to Adopt J.R.H.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY KEITH, judge. Opinion filed May 25, 2018. Affirmed.

*Lucy C. Hesse*, of Wichita, for appellant natural father.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees.

Before SCHROEDER, P.J., MALONE, J., and STUTZMAN, S.J.

PER CURIAM: J.A.B., the biological father of J.R.H., appeals the district court's decision terminating his parental rights in this adoption case. The only issue on appeal is whether the district court erred in terminating J.A.B.'s parental rights under K.S.A. 2017 Supp. 59-2136(h)(1)(D) for failing without reasonable cause to provide support for J.R.H.'s biological mother during the six months before the baby's birth. We find that the decision to terminate J.A.B.'s parental rights was supported by clear and convincing evidence, and we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We will review the facts leading up to the termination hearing in considerable detail. J.R.H. was born on September 2, 2016, in Dodge City. On November 9, 2016, her mother, K.H., freely and voluntarily consented to the adoption of the child. On November

1

15, 2016, the potential adoptive parents (the petitioners) filed a petition for the adoption of J.R.H. Noting that K.H. had consented to the adoption, the petitioners asked the district court to enter an order terminating her parental rights. The petitioners also alleged that J.A.B. was the child's biological father and that his parental rights should be terminated.

On November 16, 2016, the district court signed a temporary custody order granting the petitioners temporary custody of the child. J.A.B. filed an answer and a motion to vacate the temporary custody order. He requested immediate placement of the child with him. On December 15, 2016, the district court signed a journal entry denying J.A.B.'s motion to vacate the temporary custody order. The district court ordered J.A.B. to submit to a paternity test and granted him supervised visits with the child subject to a positive paternity test. On December 22, 2016, the petitioners filed the paternity test results, which showed that J.A.B. was J.R.H.'s biological father.

On February 16 and 17, 2017, the district court held a trial on the motion to terminate J.A.B.'s parental rights, and we will summarize the testimony of each witness in detail. K.H. testified first. K.H. stated that she began dating J.A.B. in 2014 and moved in with him sometime in the summer of that year. They broke up a few times during their relationship, and she moved out of his house for good on December 18, 2015. Soon after that, on December 30, 2015, K.H. found out she was pregnant, and she called J.A.B. to tell him. According to K.H., J.A.B. began cursing at her and told her to leave him alone.

In January 2016, K.H. moved in with her brother in Wichita. After that she moved into a maternity home in Wichita for a week or two, which was when she initially made an adoption plan. K.H. then moved to New York to live with a friend who had bought her a ticket to travel there and offered to help her out. She stayed there for about two months. During her stay in New York, she talked to J.A.B. on the phone once or twice, and he asked her not to go after him for child support because he had children in a different state. K.H. then moved back to Kansas and stayed with J.A.B.'s cousin for a few days.

2

K.H. moved back in with J.A.B. in mid-March. However, K.H. only stayed there for a day and then left when J.A.B. did not return from work on time. When J.A.B. discovered that K.H. had left, he texted her to tell her he was locking her out of the house. All of her things were in the house, including her key. When she returned, J.A.B. would not let her in the house, so she eventually called the police. She ended up staying there that night and then the next morning she went to a shelter for a few days.

After that incident, K.H. lived with Luis Rodriguez, a person she met while they were both working at Cargill. She lived with Rodriguez from March 2016 until he was deported on June 20, 2016. During that time, J.A.B. provided K.H. with no support and did not contact her even though he knew how to reach her. Rodriguez supported K.H. by paying the rent, paying bills, and buying her clothes, food, and items for the baby. At one point, K.H. had decided to parent the baby with Rodriguez, and he was willing to do so even though it was not his baby. When Rodriguez was deported, he gave K.H. $2,000.

K.H. moved in with N.N. in Garden City in July. N.N. had been K.H.'s foster mother when she was younger. At that point, K.H. began thinking about the adoption plan again, but ultimately, she thought she would parent the child. K.H. stayed with N.N. until she had the baby in September. During that time, she kept in contact with J.A.B. and asked him if he was going to be there for the baby. J.A.B. did not have a definite answer, stating he would wait and see when the baby came.

J.A.B. constantly said he was not going to pay child support. K.H. testified that J.A.B. told her he would kill her if she put the baby up for adoption, but he would also kill her if she ever went after him for child support. J.A.B. knew that K.H. was living with N.N., and he knew where N.N. lived, but he never sent anything to K.H. She testified that she would text J.A.B. to tell him when her doctor appointments were and to ask if he wanted to go with her. J.A.B. never responded and never came to the appointments, even to wait in the waiting room.

3

K.H. was scheduled for a C-section delivery at 9 a.m. on September 2, 2016, and she told J.A.B. about the date. J.A.B. was not at the hospital during the delivery, but he came to the hospital the next day. When he came to the hospital, all he brought was a balloon. J.A.B. still did not believe he was the father and wanted to submit to a DNA test, but he also wanted to sign the birth certificate and change the baby's name. Eventually, K.H. told J.A.B. that he needed to buy some things for the baby, so he bought a car seat, a small package of diapers, and a small can of formula. When they were leaving the hospital, K.H. asked him if she and the baby could come live with him, but he said no.

One night when she was at N.N.'s home with the baby, K.H. texted J.A.B. to see if he would come help her because she was tired and the baby was crying. She also let J.A.B. know that she was considering adoption. J.A.B. picked her up on September 5, 2016, and she lived with him for the next 10 days. During that time, J.A.B. would hold the baby every once in a while, but he did not make bottles or change diapers.

On September 15, 2016, K.H. argued with J.A.B. about financial support, and he pushed her on the ground. J.A.B. got on top of K.H. and started punching her in the head and face until she lost consciousness. He also put his hands over her mouth and nose. He shoved her out of the apartment and locked the door. A neighbor heard the fight and called 911. When the police arrived, K.H. was bleeding and J.A.B. said that she had fallen down. The police arrested J.A.B. After that incident, K.H. went back to N.N.'s house, and the next day she obtained a protection from abuse (PFA) order against J.A.B.

K.H. testified that she contacted J.A.B. about a month after the PFA, in the middle of October. J.A.B. visited the baby on October 22, 2016. She asked him for money and he gave her $100. J.A.B. saw the baby again on October 30, 2016. He bought about $90 worth of baby items at Walmart. He also gave K.H. $200 because it was her birthday. During that visit, K.H. testified that J.A.B. told her to "do whatever you want, I don't care." K.H. then decided to move forward with the adoption plan.

4

Jason Depew testified next. He stated that he had been employed by the Sexual Assault Domestic Violence Center in Hutchinson, Kansas, since April 2016. Depew testified that J.A.B. and the petitioners had called him to work out court-ordered visitation, which occurred on January 22, 2017. Depew testified that the baby became upset when she was in the room with J.A.B. But when employees tried to help J.A.B. learn methods that could calm the baby, he was not cooperative. Depew decided to end the visit and try to reinstate it at a later date. Depew spoke with J.A.B. again on February 3, 2017, and he testified that J.A.B. was not cooperative with visitation plans. Depew testified that J.A.B. told him that if they did not quit making things difficult for him, he would talk to the judge and get the center shut down.

Julie Samaniego also testified. She is a marriage and family therapist at Westside Christian Counseling Center and is also the director and founder of Circle of Love Maternity Home, which is an organization that helps pregnant women who have chosen adoption for their babies. She testified that K.H. came to her for assistance in January 2016 when she was pregnant with J.R.H. She talked to K.H. again in July 2016, when K.H. told her that Rodriguez had been deported and that she was having trouble finding a place to stay. Samaniego gave her several resources in Dodge City to help her with the baby. Samaniego also testified that J.A.B. called her once and made comments to her that she found to be threatening.

N.N. testified next. She testified that K.H. came to live with her in July 2016. She testified that after the baby was born, K.H. kept wanting to work things out with J.A.B. so they could parent the child together, even though N.N. did not think it was a good idea. She reiterated K.H.'s testimony that J.A.B. did not want K.H. to try to get child support from him. N.N. also testified about K.H. going to live with J.A.B. until he beat her up on September 15, 2016, and that she came to live with N.N. afterwards. K.H. lived with N.N. until November, when Samaniego came and picked her up. She testified that during those two months, J.A.B. never called to ask how K.H. was doing or to find out about his

baby. She saw threatening text messages J.A.B. sent to K.H., stating he would kill her if she went after him for child support.

J.A.B. testified next. He stated that he was born in Sudan in 1980 and came to America in 2001 due to a civil war in Sudan. Before that, he was living in a refugee camp in Kenya. He testified that he became a United States citizen.

J.A.B. testified that he did not threaten K.H. regarding the adoption. But he admitted sending the text message to her that said, "If someone terminate my blood, I will terminate their life." He testified that K.H. mentioned adoption once when she was pregnant, and he told her not to do that. According to him, she did not mention adoption again until she told him in November 2016 that she had already given the baby up for adoption. J.A.B. stated that he bought diapers, wipes, and formula when the baby was in the hospital. He stated that whatever K.H. wanted, he gave to her, unless he did not know about it. He stated that he also provided formula, wipes, and diapers to the petitioners.

J.A.B. testified that he does not have any other children. He testified that he was happy when he found out K.H. was pregnant. He testified that K.H. was living with him in Dodge City in January 2016, and he was working at Tyson in Garden City. He testified that he changed jobs to work at Cargill in Dodge City in order to help K.H. He stated that she moved in with N.N. for the last few weeks before she gave birth because she wanted someone to help her at home. J.A.B. testified that he did not lock K.H. out of the house, but one time the door was stuck because of the snow. He also testified that she always had a key to his house, including at the time of the trial.

Regarding the incident on September 15, 2016, J.A.B. testified that K.H. assaulted him. He stated that when he left with the police, there was no blood on her. He testified that he was only at the police station for two or three hours, and when he returned home, everything in the house was broken. J.A.B. testified that he was charged with battery and

6

that the police told him that K.H. also would be charged with battery. He did not know why she was not charged as well.

J.A.B. testified that after this event, he did not attempt to contact K.H. because of the PFA. He stated that K.H. went home with N.N. after the incident because she needed help after her C-section. He stated that in his culture, the girl goes with her mom after giving birth, and he was fine with that because he did not know how to take care of a C-section. He stated that where he is from, even when a girl is pregnant, it is her mother who takes care of her most of the time. He stated that the father's job is to provide the services the woman needs, like money, food, and clothes.

The district court announced its ruling in court on February 24, 2017. On March 6, 2017, the district court filed a journal entry memorializing its ruling. The district court found that K.H.'s testimony was more credible than J.A.B.'s testimony. Specifically, the district court found that J.A.B.'s testimony "was evasive and oblique, often lacking in specificity even when asked a very direct question. Multiple times, [J.A.B.'s] testimony contradicted the testimony of every other witness, and the documents entered into evidence. At times, his testimony was not realistic or believable." The district court found there was clear and convincing evidence that J.A.B.'s parental rights should be terminated for failing to support K.H. during the last six months of her pregnancy under K.S.A. 2017 Supp. 59-2136(h)(1)(D). The district court found that any support J.A.B. provided to K.H. during the last six months of her pregnancy was incidental. Finally, the district court determined that it was in the child's best interests to be adopted by the petitioners.

J.A.B. filed a timely notice of appeal. However, the district court dismissed the appeal on September 20, 2017, for failure to docket the appeal. J.A.B. filed a motion with this court to reinstate the appeal, which this court granted on October 25, 2017.

7

J.A.B. argues that the district court erred in finding that he failed to support K.H. during the last six months of her pregnancy. He contends that this finding was not supported by clear and convincing evidence. The petitioners argue that the district court's decision to terminate J.A.B.'s parental rights was supported by clear and convincing evidence. In the alternative, the petitioners argue that the district court's decision terminating J.A.B.'s parental rights is supported by clear and convincing evidence on additional statutory grounds that the district court declined to address.

Under the Adoption and Relinquishment Act, a district court may terminate the parental rights of a child's father for any of seven statutorily identified reasons, including that "the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." K.S.A. 2017 Supp. 59-2136(h)(1)(D). The district court may also consider and weigh the best interests of the child and may disregard incidental visitations, contacts, communications, or contributions. K.S.A. 2017 Supp. 59-2136(h)(2)(A) and (B).

The grounds for termination must be proved by clear and convincing evidence. K.S.A. 2017 Supp. 59-2136(h)(1). The clear and convincing evidence standard requires that the fact-finder—which in this case was the district court—conclude "that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008). The burden is on the petitioner to prove grounds for termination of a father's parental rights under K.S.A. 2017 Supp. 59-2136(h). *In re M.R.C.*, 42 Kan. App. 2d 772, 777, 217 P.3d 50 (2009)

When an appellate court reviews a district court's decision to terminate a person's parental rights based on factual findings made under K.S.A. 2017 Supp. 59-2136(h)(1), the appellate court considers whether the district court's factual findings are supported by

clear and convincing evidence when viewed in the light most favorable to the prevailing party. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). Evidence is clear and convincing if it is sufficient to establish that the truth of the facts asserted is highly probable. *In re B.D.-Y.*, 286 Kan. at 697. In making this analysis, appellate courts will not reweigh conflicting evidence, the credibility of witnesses, or other questions of fact. *In re Adoption of B.B.M.*, 290 Kan. at 244.

J.A.B. argues that the district court erred when it terminated his rights for failing without reasonable cause to provide support for the mother during the six months prior to the child's birth after having knowledge of K.H.'s pregnancy. Because J.R.H. was born on September 2, 2016, the relevant time period is March 2016 through September 2, 2016.

A father has an affirmative duty to provide financial support for the mother during the six months prior to the child's birth. *In re M.R.C.*, 42 Kan. App. 2d at 779. A father is not required to provide total support for the mother during the last six months of pregnancy. However, the support provided cannot be incidental or inconsequential. See K.S.A. 2017 Supp. 59-2136(h)(2)(B). Instead, the support "must be of some consequence and reasonable under all of the circumstances." *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 667, 29 P.3d 466 (2001), *aff'd* 273 Kan. 71, 41 P.3d 287 (2002). "This duty includes 'not only the [common-law] duty of financial support, but also the natural and moral duty of a parent to show affection, care and interest toward his or her child.' *In re Adoption of B.M.W.*, 268 Kan. 871, 873, 2 P.3d 159 (2000)." *In re Adoption of M.D.K.*, 30 Kan. App. 2d 1176, 1178, 58 P.3d 745 (2002). "It is not unreasonable to require substantial efforts by an unwed father to maintain contact with the mother and participate in the pregnancy and birth. [Citation omitted.]" *In re M.R.C.*, 42 Kan. App. 2d at 777.

On appeal, J.A.B. argues that under the circumstances of this case, the level of support he provided was reasonable. He maintains that the level of support K.H. received at or near the end of her pregnancy was reasonable because K.H. lived with her boyfriend

9

until July when she moved in with her foster mother, N.N. He states that he did not know where N.N. lived until J.R.H. was born. J.A.B. argues that in Sudan, where he lived before immigrating to the United States as an adult, it is common for a new mother to move in with her own mother while she is pregnant and after giving birth.

However, K.H. did not need to live with J.A.B. for him to provide support to her. He could have supported her even while she was living with a boyfriend or her foster mother. Instead, there is clear and convincing evidence that J.A.B. did the opposite of supporting K.H. According to the testimony of K.H., J.A.B. constantly told her that she could not get child support from him. Instead of supporting K.H. during her pregnancy, J.A.B. consistently stated that he was not sure that he was the baby's father. Based on the testimony the district court found to be credible, J.A.B. showed no more than incidental affection, care, or interest toward his child before her birth.

J.A.B. also maintains that he supported K.H. by providing a place for her to live throughout the pregnancy, regardless of whether she actually lived there. He points out that even though K.H. testified he locked her out of the house without a key, she still had a key to J.A.B.'s house when she left in March. He contends that because he "relinquished control of his property, his house, by allowing [K.H.] to keep the key, along with his expenditures that he testified to during the last 6 months of the pregnancy, the evidence presented does not rise to the level of clear and convincing required by the statute." However, J.A.B. did not "relinquish control of his property" by allowing K.H. to keep a key. Instead, he retained control of the property and he only incurred expenses that he would have incurred by living in the apartment himself.

This court has stated that in determining if a father has reasonable cause for failing to provide support to the mother for the statutory period, all relevant circumstances must be considered. *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d at 667. In making this finding, courts "must determine whether the natural father has pursued the opportunities

10

and options which were available to carry out his duties to the best of his ability." *In re Adoption of Baby Boy W.*, 20 Kan. App. 2d 295, 299, 891 P.2d 457 (1994). A "mother's needs and requirements are a relevant circumstance in determining whether a natural father acted reasonably in failing to provide her with support." *In re Baby Boy N.*, 19 Kan. App. 2d 574, 588, 874 P.2d 680, *rev. denied* 255 Kan. 1001, *cert. denied* 513 U.S. 1018 (1994). An "unwed father must act affirmatively during the mother's pregnancy to protect his rights to the child." *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d at 666.

Here, the district court determined that the evidence was clear and convincing that J.A.B. did not support K.H. during the last 6 months of her pregnancy. The district court's findings, when viewed in the light most favorable to the petitioners, are supported by clear and convincing evidence. J.A.B. provided only incidental—if any—financial support for K.H. during the six months before she gave birth to his child. See K.S.A. 2017 Supp. 59-2136(h)(2)(B) (district court may disregard incidental financial contributions). Moreover, J.A.B. provided no emotional support to K.H. prior to the baby's birth. Given that J.A.B. failed to make even minimal attempts to support or communicate with K.H., we conclude that the district court's findings are highly probable, in other words, they are supported by clear and convincing evidence.

Alternatively, the petitioners argue that the district court's decision terminating J.A.B.'s parental rights is supported by clear and convincing evidence on additional statutory grounds that the district court declined to address. However, we find it unnecessary to address these additional grounds on appeal. Based on the record in its entirety, we conclude that the district court's decision to terminate J.A.B.'s parental rights under K.S.A. 2017 Supp. 59-2136(h)(1)(D) was supported by clear and convincing evidence, and the district court's judgment should be upheld on that basis.

Affirmed.