(29 P.3d 466)

No. 86,319

In the Matter of the Adoption of Baby Girl S., a Minor Child, d.o.b. 5/20/00.

Opinion filed August 17, 2001.

*Anne Burke Miller,* of Seaton, Miller, Bell & Seaton, L.L.P., of Manhattan, for appellants, adoptive parents.

*Susan C. Jacobson,* of Jacobson & Jacobson, of Junction City, for appellee natural father.

Before PIERRON, P.J., MARQUARDT and BEIER, JJ.

MARQUARDT, J.: The potential adoptive parents appeal the trial court's denial of their motion to terminate the parental rights of M.B., the biological father of Baby Girl S. We reverse in part,

dismiss in part, and remand with instructions consistent with this opinion.

When S.S. was 18 years of age, she met 38-year-old M.B. S.S. testified that they began dating in February or March 1997. M.B. frequently stayed in S.S.'s college dorm room. In June 1998, S.S. moved to an apartment. She was the only signatory on the lease and paid the rent.

In May 1999, M.B. caught S.S. kissing another man, B.R. In June 1999, S.S. decided that she wanted to occasionally date M.B. while being free to see other people. S.S. asked M.B. to remove his belongings from the apartment. He only removed about half of his belongings and continued to go over to S.S.'s house and "demand sex." S.S. testified that she allowed M.B. to visit because she was afraid of him.

S.S. believed that M.B. was using the knowledge of her having a sexual relationship with B.R. as "some strange sort of extortion for sex." S.S. accused M.B. of entering her apartment without knocking, eavesdropping on her telephone conversations, and making threats. M.B. kept a journal of his thoughts, and many of them related to his desire to injure B.R. M.B.'s comments included, "He's easy to kill!" and "[N]ote: break two of his body parts (arm & 1 finger), knock out right side of mandible and a few upper teeth, crack both orbits (stopping point at this time). Don't kill him."

In August 1999, S.S. began to suspect that she was pregnant. S.S. took a home pregnancy test which was positive. S.S. and M.B. went to a doctor to have a pregnancy test performed. This test was positive, as well. S.S. underwent a quantitative hormone test because M.B. wanted to make sure the baby was his. The results showed that M.B. was the father.

S.S. testified that she wanted to be "adult for the baby," which included having a civil relationship with M.B. However, in October, S.S. discovered that M.B. had broken his promise to her and had called B.R.'s girlfriend to inform her about S.S. and B.R.'s relationship. S.S. and M.B. argued and S.S. claimed that M.B. threatened to kill her.

S.S. immediately scheduled an appointment for joint counseling. At the last counseling session on November 2, 1999, S.S. and M.B.

concluded that they could not continue their romantic relationship. S.S. testified that M.B. told her if things could not be the way they were before, he did not want anything to do with her. The therapist's testimony verified M.B.'s statement.

S.S. had no contact with M.B. from November 2, 1999, until March 2000. During this time period, S.S. considered putting her baby up for adoption. S.S. contacted M.B. in March 2000 and asked for his consent to put the baby up for adoption. M.B. refused and stated that he wanted one of the biological parents to raise the child with financial assistance from the other parent.

After S.S.'s phone call, M.B. made several attempts to contact her. S.S. refused to see him. S.S. delivered the baby on May 2, 2000.

On May 4, 2000, the adoptive parents filed a petition for adoption. S.S. signed a written consent for adoption. The adoptive parents contended that they did not need M.B.'s consent because he had failed to provide support for S.S. during the last 6 months of her pregnancy. M.B. responded by filing a motion to be named a party to the case.

At the hearing on the adoption petition, the trial court concluded that M.B. and S.S. were in contact with each other between March 17, 2000, and the date of the baby's birth. The trial court believed that S.S. "blocked [M.B.] out of any opportunity to provide support." Accordingly, the trial court denied the petition for adoption. The adoptive parents timely appeal.

On appeal, the adoptive parents claim that the trial court erred when it denied the adoption and the efforts made by M.B. were not intended to provide support for S.S.

At common law, the unwed father had virtually no rights to the child of an unwed mother. By statute, the unwed father has some rights; however, the unwed father must act affirmatively during the mother's pregnancy to protect his rights to the child. All facts and circumstances must be considered in determining the rights of the unwed father to the child.

A trial court's decision whether to terminate a natural father's parental rights under K.S.A. 59-2136(h) will be upheld if supported by substantial competent evidence. An appellate court does not

weigh the evidence or pass upon the credibility of witnesses and must review the evidence in the light most favorable to the party prevailing below. *In re D.M.M.*, 24 Kan. App. 2d 783, 786, 955 P.2d 618 (1997). Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Sampson v. Sampson*, 267 Kan. 175, 181, 975 P.2d 1211 (1999).

K.S.A. 59-2136 provides in pertinent part:

"(h) . . . [T]he court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

. . . .

"(4) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth."

"Support," as that term is set forth in K.S.A. 59-2136(h)(4), does not require that the father provide total support for the mother; however, support that is incidental or inconsequential in nature is not sufficient. Support from the father during the last 6 months of an unwed mother's pregnancy must be of some consequence and reasonable under all of the circumstances. *In re Adoption of Baby Boy B.*, 254 Kan. 454, 464, 866 P.2d 1029 (1994).

Those instances specified in K.S.A. 59-2136(h)(1)-(7) in which consent may be declared unnecessary are examples of situations in which the relationship of a natural father is little more than biological. *D.M.M.*, 24 Kan. App. 2d at 787.

It is not unreasonable to require substantial efforts by an unwed father to maintain contact with the mother and participate in the pregnancy and birth. *D.M.M.*, 24 Kan. App. 2d at 787. In determining whether a father has failed without reasonable cause to provide support for the mother during the last 6 months of her pregnancy, all the relevant circumstances must be considered. The mother's refusal of assistance offered by the natural father is a factor in determining if the father provided support to the mother. *In re Adoption of Baby Boy W.*, 20 Kan. App. 2d 295, 299, 891 P.2d 457 (1994).

In *In re Adoption of Baby Boy S.*, 16 Kan. App. 2d 311, 822 P.2d 76 (1991), this court affirmed the termination of a natural

father's rights pursuant to K.S.A. 59-2136(h)(4). In that case, the natural father did not provide the mother with money, groceries, or a place to live. Similarly, he did not give her his paycheck or babysit her other children. In the case of *Baby Boy W.*, the natural father made general offers of support, which included a statement to the mother that "if she needed anything to tell me I would do it." 20 Kan. App. 2d at 297. The father did not offer to give the mother specific sums of money, take her to doctor's appointments, pay for her prescription vitamins, buy food or clothing, or pay for any of her other living expenses. Termination of the natural father's parental rights is appropriate where the father merely makes general offers of support.

In contrast, the natural father in *Baby Boy B.* gave the mother $75 or $80 to spend on entertainment and restaurant meals, $100 for maternity clothing, and $130 for undisclosed expenses. The natural father in that case also attempted to marry the mother, gave her money, and took her out to eat approximately once a week for a 2-month period. He also offered the mother $1,000 from his anticipated tax refund. Given these circumstances, the Kansas Supreme Court affirmed the trial court's decision to deny the petition for adoption. 254 Kan. at 464-65; see *In re K.D.O.*, 20 Kan. App. 2d 559, 889 P.2d 1158 (1995).

The trial court agreed with S.S. that M.B. had failed to provide support for the period of time from November 2, 1999, to March 17, 2000. This finding has not been appealed by M.B. Accordingly, we need only consider the period from March 17, 2000, until May 2, 2000, the date of the baby's birth.

S.S. takes the position that M.B. provided no tangible or consequential support for the duration of her pregnancy. Accordingly, we must focus on the testimony provided by M.B. and his witnesses in the light most favorable to M.B. as the party prevailing below.

Dennis Wilson testified that he offered M.B. some baby items in December. M.B. retrieved the items from Wilson in June, after the baby was born. This falls outside the 6-month period contemplated by K.S.A. 59-2136(h)(4). M.B. admitted that he did not deliver the items to S.S., and the crib was still in Wilson's garage.

There is nothing in the record on appeal to show that any of the items ever reached S.S. during any stage of her pregnancy.

Robert Roman testified that M.B. always paid the bill when he and S.S. went to restaurants, and they always drove M.B.'s car, but Roman did not see M.B. buy dinner for S.S. after October 1999. Paige Jackson also saw M.B. pay for S.S.'s meals, but she had no contact with S.S. after October 1999. Paige's husband, Ernie Jackson, testified that he saw M.B. do the laundry and dishes a couple of times after S.S. became pregnant.

Jessica Whiting lived at the same house as M.B. for a time. Whiting testified that she heard M.B. try to call S.S. on five or six different occasions. Whiting also saw M.B. do extensive baby research on the internet. M.B. asked Whiting if she would be able to provide day care for the child. As S.S.'s due date approached, Whiting called the hospital at M.B.'s request to see if S.S. had delivered the baby.

Tricia Gowan, a personnel officer for Junction City, testified that in September 1999, M.B. asked her if he would be able to insure S.S. and the baby under his health plan. In May 2000, M.B. placed the baby on his health insurance 21 days after her birth. The record on appeal does not disclose whether S.S. was informed of this event.

M.B.'s brother, D.B., testified that he called S.S. to tell her "[M.B.] has financial support for her as well as actual physical support, such as getting her things that she needs, as well as monies, or a host of all of the other things that an expectant mother needs." D.B. testified that she told him she did not want to have anything to do with M.B. D.B. made a second phone call to S.S. on M.B.'s behalf with an offer of $300 per month. S.S. told D.B. that she was busy and could not discuss it at that time. Neither M.B. nor D.B. ever called S.S. again to renew M.B.'s offer.

M.B. testified that S.S. told him she wanted to be financially independent. M.B. testified that he did not personally contact S.S. because he wanted to give her a chance to "cool down." M.B. believed that this was accomplished by not extending specific offers of help and instead telling S.S. that he would "do whatever it takes

to ensure the baby has a lifestyle at least better than I had as a child." M.B. did not offer money to S.S. when they spoke in March.

M.B. claims that he did everything possible to help S.S., given the circumstances. M.B. never sent S.S. any money, bought groceries for her, made a doctor's appointment, or provided any vitamins or maternity clothes after November 2, 1999. After the baby was born, M.B. sent S.S. a check for $150.

The adoptive parents contend that the case law addressing stepparent adoptions is relevant to a discussion of K.S.A. 59-2136(h)(4). This is a valid comparison. We note that in *Baby Boy S.*, the court held that a termination brought under K.S.A. 59-2136(h)(4) is analogous to cases where a termination is sought via K.S.A. 59-2136(h)(7). 16 Kan. App. 2d at 313. That portion of the statute allows termination of parental rights where a father has failed to assume the duties of a parent for 2 consecutive years prior to a proposed adoption. The language is similar to the provision addressing stepparent adoptions. See K.S.A. 59-2136(d).

There is no doubt that M.B. made some attempts to help S.S.; however, few if any of these attempts were concrete offers of support. Instead, M.B. proposed to "pay for all of the costs—I would pay for anything that she—that she couldn't pay for, I would pay for, anything that she needed concerning the baby I would pay for." However, M.B. never sent any money or provided any other assistance to S.S. These vague offers of support are similar to the ones made by the natural father in *Baby Boy W.*

S.S. received no benefit from the used baby clothing and furniture M.B. solicited because they were not delivered to her. This cannot be considered support, since S.S. did not reap the benefits. Similarly, we see no support value in M.B.'s internet research and phone calls. They did not help S.S. financially or emotionally during her pregnancy.

The record on appeal discloses that M.B. did not provide any concrete support for S.S. during the last 6 months of her pregnancy. The offers of support relied upon by the trial court are not sufficient to bar the application of K.S.A. 59-2136(h)(4). Moreover, we respectfully disagree with the trial court's contention that S.S.

refused M.B.'s offers of support. M.B. thought that it was better to avoid contact with S.S. to allow her to "cool off."

We hold that the trial court's decision is not supported by substantial competent evidence. There is nothing in the record on appeal which would support the trial court's conclusion that either M.B. provided support, or that S.S. refused such support. Accordingly, the decision of the trial court is reversed, with instructions to terminate M.B.'s parental rights and grant the petition for adoption.

Next, the adoptive parents claim that the trial court failed to make specific findings of fact and conclusions of law with respect to the issue of whether M.B. abandoned S.S.

There is no evidence in the record on appeal to show that the adoptive parents objected to the trial court's findings of fact and conclusions of law. In the absence of an objection at the trial court level to the failure to make findings, the trial court is presumed to have made all necessary findings, and this precludes appellate review of this issue. *In re Care & Treatment of Hay*, 263 Kan. 822, 836, 953 P.2d 666 (1998).

We do not have jurisdiction to consider this issue and it is dismissed.

Reversed in part and dismissed in part. The case is remanded with instructions to terminate M.B.'s parental rights and grant the petition for adoption.