217 P.3d 50 (2009)
In the Matter of M.R.C., a Minor.
No. 101,892.
Court of Appeals of Kansas.
October 2, 2009.
*51 Michael J. Studtmann, of Law Office of Michael J. Studtmann, P.A., of Wichita, for appellant natural father.
Richard A. Macias, of Wichita, for appellee Adoption Centre of Kansas, Inc.
Before MALONE, P.J., PIERRON and LEBEN, JJ.
MALONE, J.
E.L.T., the biological father of M.R.C., appeals the district court's decision terminating his parental rights in this adoption case. The only issue is whether the district court erred in terminating E.L.T.'s parental rights pursuant to K.S.A.2008 Supp. 59-2136(h)(1)(D) for failing without reasonable cause to provide support for M.S.C., the biological mother, during the 6 months prior to M.R.C.'s birth. We conclude the district court's decision to terminate E.L.T.'s parental rights was supported by clear and convincing evidence.
M.S.C. and E.L.T. are the unwed, biological parents of M.R.C., born May 5, 2008. They had a tumultuous relationship beginning in 2002 when they conceived another child, R.T., who was born on October 4, 2002. M.S.C. was involved in another relationship at the time of R.T.'s birth, and she initially informed E.L.T. that she had miscarried R.T. A year later, E.L.T. learned for the first time that M.S.C. had not miscarried R.T. Upon learning of the child, E.L.T. filed a paternity action and obtained visitation rights with R.T. Over the next few years, M.S.C. and E.L.T. had an on-again off-again relationship.
On March 22, 2007, E.L.T. filed a motion in the paternity case to change the custody of R.T. After M.S.C. failed to appear, the district court granted E.L.T.'s motion. M.S.C. later denied receiving notice of the change of custody motion. E.L.T. admitted that in spite of the signed certificate of service attached to his motion, he did not mail notice of the hearing to M.S.C. Instead, he asked his sister to hand deliver the service, but the record does not reflect that she did so. E.L.T. contacted M.S.C. after he obtained the change of custody order. According to M.S.C., E.L.T. informed her that she had "lost her rights" to R.T., but if she moved back in with him, he would restore her parental rights.
M.S.C. moved in with E.L.T. in August 2007, and their relationship began to improve. In September 2007, M.S.C. learned that she was pregnant and she informed E.L.T. of the pregnancy. While they lived together, E.L.T. paid for the food, rent, utilities, gas, and babysitting costs. E.L.T. purchased prenatal vitamins for M.S.C., and he took her to the hospital for treatment at least once in November 2007.
By December 2007, however, the relationship began to fall apart again. M.S.C. had informed E.L.T. that she did not want to have sex because she was worried about some bleeding associated with the pregnancy. According to M.S.C., one night after she took *52 prescription sleep medication that E.L.T. had given her, she fell into a deep sleep but awoke to find E.L.T. having sex with her. On December 10, 2007, M.S.C. and E.L.T. had a fight in which they pushed each other and E.L.T. destroyed some personal property. Following the fight, M.S.C. told E.L.T. that she was leaving him and departed from the residence. Later that night, M.S.C. returned to the residence to get her clothes, and she found that E.L.T. had attempted suicide. M.S.C. immediately called an ambulance, and E.L.T. was hospitalized for 2 to 3 days. Nevertheless, according to M.S.C., E.L.T. placed several harassing and threatening phone calls from the hospital.
On December 31, 2007, M.S.C. filed for a protection from abuse (PFA) order. In support of the order, she cited the December 10, 2007, fight which had involved physical contact and the harassing phone calls. The district court issued a final PFA order on January 10, 2008, prohibiting E.L.T. from having any contact with M.S.C.
After M.S.C. left E.L.T. on December 10, 2007, E.L.T. did not provide any money to M.S.C. even though he knew she was unemployed. E.L.T. did not establish a bank account in M.S.C.'s name, and he did not try to get money to her through friends or family. E.L.T. had worked for the same towing company for 7 years, and depending on his commissions, he earned between $38,000 and $42,000 annually. E.L.T. was earning approximately $3,000 per month in the spring of 2008, and in February 2008, he received an income tax refund of over $3,000. M.S.C. never told E.L.T. that she did not want any support from him.
M.S.C., who still believed E.L.T. had terminated her rights to R.T., did not have any contact with R.T. after she left the residence on December 10, 2007. However, during the spring of 2008, E.L.T. took R.T. for regular visits with M.S.C.'s family, typically every other weekend. In mid-March, M.S.C.'s friend Jamie encountered E.L.T. at a flea market. Jamie told E.L.T. that M.S.C. had miscarried. Jamie later told M.S.C. she had lied to E.L.T. so that M.S.C. could have a "peaceful" pregnancy. M.S.C. never tried to contact E.L.T. to tell him she had not miscarried. When E.L.T. told his sister about the miscarriage, she warned him not to believe the news because M.S.C. had lied about a miscarriage during her pregnancy with R.T. Nevertheless, E.L.T. never made any attempts to confirm whether M.S.C. was still pregnant.
M.S.C. gave birth to M.R.C. on May 5, 2008, in Sedgwick County, Kansas. Shortly thereafter, M.S.C. relinquished her parental rights to Adoption Centre of Kansas, Inc. (Adoption Centre). Adoption Centre provided notice of M.R.C.'s birth to E.L.T. on May 7, 2008. On May 21, 2008, Adoption Centre filed a petition for termination of E.L.T.'s parental rights. In the petition, Adoption Centre alleged that E.L.T. had failed to provide support for M.S.C. during the 6 months prior to M.R.C.'s birth despite having knowledge of the pregnancy. E.L.T. filed an answer to Adoption Centre's petition and admitted that he was M.R.C.'s father. However, E.L.T. denied that he had failed without reasonable cause to provide support for M.S.C. during the 6 months prior to M.R.C.'s birth. Instead, E.L.T. asserted that M.S.C. had a PFA order against him prohibiting contact between the parties. E.L.T. also claimed that M.S.C. had misled him into believing that she had miscarried M.R.C.
The district court held a bench trial on December 4, 2008. M.S.C. and E.L.T. testified concerning the history of their relationship and the events leading up to M.R.C.'s birth. The records concerning the PFA order were admitted into evidence. Additionally, M.S.C.'s stepparents testified that they did not have any contact with M.S.C. during her pregnancy. However, M.S.C.'s stepmother also testified that on one occasion she sent her younger son down the block to where M.S.C. was residing in February 2008 to give a birthday gift to a child who was staying at the same residence. The stepmother testified that M.S.C. was living in "some quad apartments" at "45th and Handley" down the street from one of her girlfriends.
After hearing the evidence, the district court found that E.L.T. provided support for M.S.C. during only the first 35 days of the *53 last 6 months of her pregnancy, which the court found to be incidental. The district court determined that under Kansas law, the duty of the father is not a passive one; it is an active obligation. The district court found that E.L.T. used the PFA as an excuse for not providing support and he passively accepted the rumor that M.S.C. had miscarried. The district court concluded there was clear and convincing evidence that after having knowledge of the pregnancy, E.L.T. failed without reasonable cause to provide support for M.S.C. during the 6 months prior to M.R.C.'s birth. Accordingly, the district court terminated E.L.T.'s parental rights to M.R.C. pursuant to K.S.A.2008 Supp. 59-2136(h)(1)(D). E.L.T. timely appealed.
On appeal, E.L.T. claims the district court erred in terminating his parental rights for failing to support M.S.C. during the 6 months prior to M.R.C.'s birth. E.L.T. does not contest the district court's finding that he provided support for M.S.C. for only the first 35 days of the last 6 months of her pregnancy. However, E.L.T. maintains that the district court failed to make sufficient findings that his failure to support M.S.C. was without reasonable cause. Specifically, E.L.T. maintains that the PFA order prohibiting contact between the parties and the false information about the miscarriage provided reasonable cause for his failure to support M.S.C.
An appellate court reviews the district court's decision terminating a person's parental rights to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, the district court's factual findings were highly probable, i.e., supported by clear and convincing evidence. See In re B.D.-Y., 286 Kan. 686, 697, 705-06, 187 P.3d 594 (2008). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705, 187 P.3d 594.
K.S.A.2008 Supp. 59-2136(h)(1) provides that a court may terminate a father's parental rights in the course of a nonstepparent adoption proceeding if it finds by clear and convincing evidence any of the following:
"(A) The father abandoned or neglected the child after having knowledge of the child's birth;
"(B) the father is unfit as a parent or incapable of giving consent;
"(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;
"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

"(E) the father abandoned the mother after having knowledge of the pregnancy;
"(F) the birth of the child was the result of rape of the mother; or
"(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition." (Emphasis added.)
Additionally, the district court may consider and weigh the best interests of the child and may disregard incidental visitations, contacts, communications, or contributions. K.S.A. 2008 Supp. 59-2136(h)(2)(A) and (B). The burden is on the petitioner to prove grounds for termination of a father's parental rights under K.S.A.2008 Supp. 59-2136(h). In re Adoption of D.D.H., 39 Kan.App.2d 831, 837, 184 P.3d 967 (2008).
In this case, only K.S.A.2008 Supp. 59-2136(h)(1)(D) is at issue. Under this subsection, the court is authorized to terminate the father's parental rights based on clear and convincing evidence that the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the 6 months prior to the child's birth. The term "support" does not include a requirement that the father provide total support for the mother; however, support that is incidental or inconsequential in nature is not sufficient. The support must be of some consequence and reasonable under all the circumstances. Mere general offers of support are not sufficient. In re Adoption of M.D.K., 30 Kan.App.2d 1176, 1178, 58 P.3d 745 (2002).
*54 When the district court finds that "`a father's reasonable efforts to provide for his child's welfare failed because of interference by the mother, adoption agency, or adoptive parents, the statute should not operate to terminate his parental rights.' [Citation omitted.]" In re Adoption of Baby Boy S., 22 Kan.App.2d 119, 130, 912 P.2d 761, rev. denied 260 Kan. 993, cert. denied 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996). However, a mother's failure to act upon a general offer of assistance by not contacting the father and telling him what she specifically needs does not amount to interference or a refusal of financial help. In re M.D.K., 30 Kan.App.2d at 1180, 58 P.3d 745. It is not unreasonable to require substantial efforts by an unwed father to maintain contact with the mother and participate in the pregnancy and birth. In re Adoption of Baby Girl S., 29 Kan.App.2d 664, 667, 29 P.3d 466 (2001), aff'd 273 Kan. 71, 41 P.3d 287 (2002).
In In re K.D.O., 20 Kan.App.2d 559, 889 P.2d 1158 (1995), this court upheld a district court's decision denying an adoption agency's petition to terminate the father's rights after the father made several, specific offers of support to the mother during the pregnancy. In that case, except for $100 which the father gave to the mother, the father did not provide the mother with any support during her pregnancy. However, when the mother informed the father that she was not going to have an abortion, he told her that he would support her and the baby. The father offered money to the mother, and he offered to obtain other items for the baby. The father offered the use of his vehicle if the mother needed a ride, and he offered to drive the mother to the hospital when the baby was due. In addition, the father offered to marry the mother and to pay for her divorce from her present husband. The mother refused all offers of support and refused to let the father see her. The district court found that although the father failed to provide support to the mother during her pregnancy, he had a reasonable cause for his failure, namely, the mother's refusal to accept his offers of support. 20 Kan.App.2d at 561, 889 P.2d 1158. On appeal, this court declined to reweigh the evidence and upheld the district court's decision. 20 Kan.App.2d at 562, 889 P.2d 1158.
In contrast, in In re M.D.K., unwed parents lived apart during the last 6 months of the pregnancy. During this time, the father's parents bought the mother's car from her for $245 more than what was owed on the car and they provided her with some blankets and a picture frame. The father called the mother once a month, which generally made the mother upset, and she threatened to obtain a restraining order if he continued to call. The father provided no monetary or emotional support to the mother during this time in spite of having a steady income and few expenses. The father testified the mother never asked him for support because she was living with her parents and everything was going well. However, the mother testified she never refused support from the father. The father had also been advised by an attorney that he was not required to pay support without a court order. Based upon this evidence, the district court terminated the father's parental rights under K.S.A. 59-2136(h). 30 Kan.App.2d at 1177, 58 P.3d 745.
On appeal, the father asserted that the mother thwarted his attempts to provide support because she asked him to quit calling her and threatened to obtain a restraining order against him. This court concluded that the father's argument had no legal merit because the father had an affirmative duty to provide support to the mother, and he could have fulfilled that duty without having contact with her. Thus, this court found substantial competent evidence supported the district court's decision terminating the father's parental rights. 30 Kan.App.2d at 1181-82, 58 P.3d 745.
In a concurring opinion, Judge Carol A. Beier, now Justice Beier, elaborated on the duty of the unwed father to provide support during the pregnancy, even in situations where the mother does not want contact with the father:
"An unwed man who learns that his unwed sexual partner is pregnant and intends to [have the baby] has only one way to ensure he can exercise his parental rights after the birth, regardless of whether *55 the mother intends to exercise hers: He must relinquish possession and control of a part of his property or income to the [mother] during the last 6 months of the pregnancy so that she may use the items or money to support herself or prepare for the arrival of the child. He must do this regardless of whether his relationship with the [mother] continues or ends. He must do this regardless of whether the [mother] is willing to have any type of contact with him whatsoever or to submit to his emotional or physical control in any way. ...
"Even in the most acrimonious of situations, a [father] can fund a bank account in the [mother's] name. He can have property or money delivered to the [mother] by a neutral third party. He can and must be as creative as necessary in providing material assistance to the [mother] during the pregnancy and, the law thus assumes, to the child once it is born. He must not be deterred by the [mother's] lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant." 30 Kan. App.2d at 1182-83, 58 P.3d 745.
Returning to our facts, although E.L.T. paid rent and provided food and prenatal vitamins for M.S.C. while she lived with him at the beginning of the pregnancy, all support ceased when M.S.C. left the residence on December 10, 2007. From that point, the undisputed evidence showed that E.L.T. provided no support to M.S.C. M.S.C. exhibited her desire that E.L.T. stay away from her by seeking the PFA order. By the express terms of the final PFA order, E.L.T. was prohibited from having any contact with M.S.C. unless authorized by the court. E.L.T. never attempted to modify the final PFA order to allow him to have contact with M.S.C. either directly or through a third party.
E.L.T. argues that the final PFA order prevented him from supporting M.S.C. because he could not contact her during the pregnancy. Although the final PFA order prevented E.L.T. from contacting M.S.C., the order did not preclude E.L.T. from supporting M.S.C. during the pregnancy. At the time the district court issued the final PFA order, E.L.T. knew that M.S.C. was pregnant and that she was unemployed. Nevertheless, E.L.T. failed to offer any specific assistance, monetary or otherwise, to assist M.S.C. with the pregnancy. E.L.T. did not attempt to open a bank account for M.S.C. and he did not try to get money to her through friends or family. Unlike the mother in In re K.D.O. who repeatedly refused the father's offers of support, M.S.C. never told E.L.T. that she did not want support from him. The district court appropriately found that E.L.T. could not utilize the final PFA order, which he had precipitated by his own abusive conduct, as an excuse for not providing support to M.S.C. during the last 6 months of the pregnancy.
E.L.T. also argues that M.S.C. interfered with his ability to provide support by failing to correct Jamie's lie about the miscarriage. However, the district court found it was unreasonable for E.L.T. to believe the "rumor" about M.S.C.'s miscarriage, especially in light of M.S.C.'s previous lie that she had miscarried R.T. The district court stated:
"This Court specifically [finds] that [E.L.T.] knew or should have known that the pregnancy was not terminated. It would have taken very little effort to have found out. Again, I go back to the case that clearly states that it is a proactive duty of the father. In this case, therein lies the problem. When these facts are applied to the law, [E.L.T.] did not take a proactive stance."
Given the history between E.L.T. and M.S.C., the district court's finding that it was unreasonable for E.L.T. to believe the rumor about M.S.C.'s miscarriage was supported by clear and convincing evidence. There was no evidence that M.S.C. told Jamie to lie to E.L.T. about the miscarriage. Furthermore, E.L.T. took no steps to confirm whether the information about the miscarriage was true. E.L.T. had regular contact with M.S.C.'s family in the spring of 2008. Although M.S.C.'s stepparents testified they did not have contact with her during the pregnancy, the stepmother at least knew how to locate M.S.C. during this time. It seems clear that *56 E.L.T. could have learned the truth about the alleged miscarriage had he tried to do so.
Under Kansas case law, a father has a duty to take affirmative action to manifest a full commitment to parenting responsibilities and to exercise reasonable diligence to discover whether the mother has lied to him concerning the existence of the child. See In re Adoption of A.A.T., 287 Kan. 590, Syl. ¶ 13, 196 P.3d 1180 (2008) (court denied father rights to child even though mother lied about having abortion). Here, the false statement about the miscarriage did not excuse E.L.T. from discovering the truth and providing support to M.S.C. In any case, E.L.T. had already failed to provide support to M.S.C. for 3 months before he heard about the miscarriage. The evidence is undisputed that E.L.T. provided no support to M.S.C. between when she left the residence on December 10, 2007, and when he heard about the supposed miscarriage in mid-March 2008.
In summary, we find this case to be very similar to In re M.D.K. Although M.S.C. did not want E.L.T. to contact her, she never refused any offers of support from him. E.L.T. provided no monetary or emotional support to M.S.C. during most of the last 6 months of her pregnancy despite having sufficient resources to provide support. E.L.T. acted passively and he failed to exercise his affirmative duty in order to preserve his parental rights. The district court's finding that E.L.T. failed without reasonable cause to provide support for M.S.C. during the 6 months prior to M.R.C.'s birth was supported by clear and convincing evidence. Accordingly, we conclude the district court did not err in terminating E.L.T.'s parental rights pursuant to K.S.A.2008 Supp. 59-2136(h)(1)(D).
Affirmed.