NOT DESIGNATED FOR PUBLICATION

No. 129,277

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of BABY BOY B.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Reno District Court; KEITH SCHROEDER, judge. Submitted without oral argument. Opinion filed April 3, 2026. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant natural father, and *T.H.*, natural father, appellant pro se.

*Austin K. Vincent*, of Topeka, for appellees adoptive parents.

Before GARDNER, P.J., ARNOLD-BURGER and SCHROEDER, JJ.

PER CURIAM: The district court terminated Father's parental rights to Baby Boy B. by finding that Father failed to sustain support for Mother during the six months prior to the birth of Baby Boy B. Father appeals.

FACTUAL AND PROCEDURAL HISTORY

M.S., Mother, first met T.H., Father, around 2021 when she was 17 and he was approximately 38, and they maintained an intermittent relationship from 2022 through 2024.

1

The most recent cohabitation period began in January 2024, when Mother moved into Father's house. Father's income was limited to disability payments, and Mother worked various jobs during the time living with Father. Father would often use Mother's debit card and food assistance card for household purchases or food. In February 2024, Mother and Father purchased a Ford Crown Victoria (Ford) vehicle for $800, funded by Mother and a loan from Father's mother, which Mother paid back. The vehicle was titled in Father's name due to lower insurance rates. During the time they lived together, Mother and Father also filed their taxes together as married filing jointly.

Mother and Father became aware of Mother's pregnancy on March 26, 2024. A few days later, Mother told Father she wanted to place the child up for adoption.

On several occasions during Mother's pregnancy, Father told Mother to move out of his house. On July 15, 2024, Mother moved out of Father's house and into a hotel. Mother continued to use the Ford for a short period until Father took the car from Mother's hotel without her knowledge. Mother stayed at the hotel for the next few weeks and then in late August she moved into an apartment where she stayed for the remainder of her pregnancy.

Father filed a protection from abuse (PFA) order against Mother, the day after she moved out. Following a hearing on August 5, 2024, the court then entered the PFA order, prohibiting Mother from having any contact with Father. After the hearing, Mother's mother, S.B., met with Father and showed him proof of insurance for the Ford so that he could transfer the title to the vehicle to Mother. Father provided S.B. with a key for the Ford, and thereafter Mother retained possession of the vehicle.

In late August, Mother filed a petition for protection from stalking (PFS) against Father. Around the same time, Father also moved to modify his PFA order to allow text communication with Mother. In September, the district court held a hearing on Mother's

2

PFS and, during that proceeding, also considered Father's motion to modify his PFA. The court denied both. Father's PFA against Mother remained in place, and any communication regarding Mother from that point on was between Father and S.B.

In October 2024, Mother's grandparents bought Mother a different vehicle and S.B. sold the Ford to Father for $800. In early November, all communications between Father and S.B. ended. Baby Boy B. was born November 20, 2024.

After Mother gave birth to Baby Boy B., Adoptive Parents filed a petition for adoption accompanied by Mother's affidavits, in which she consented to the adoption and identified Father as the natural father of Baby Boy B. Adoptive Parents obtained temporary custody of Baby Boy B.

On January 2025, Adoptive Parents filed a petition to terminate Father's parental rights under K.S.A. 59-2136(h)(1)(D), alleging that, after having knowledge of the pregnancy, Father failed to provide support to the mother of the child during the six months prior to the child's birth. Around this same time, Father filed for divorce from Mother. The divorce action is not part of this appeal.

The district court held a bifurcated termination hearing on April 8 and April 17, 2025. The district court heard testimony from Mother and 10 additional witnesses, but Father did not testify. On the first day, Adoptive Parents called three witnesses, Mother, Mother's grandmother, D.B., and a family friend, who all described the couple's relationship. They confirmed that Mother paid for everything. On cross-examination Father's counsel focused on the existence of a common-law marriage.

On the second day, S.B. was the last of the Adoptive Parents' witnesses to testify. In large part, her testimony confirmed Mother's testimony. Topics included communication and interactions she had with Father after he got a PFA against Mother

3

and Father's support of Mother. S.B. also discussed the purchase of the Ford and the request for Father to cosign with Mother on a new apartment, which he declined. On cross-examination, Father's counsel questioned her on the same topics, as well as the existence of a common-law marriage.

Father's witnesses included his mother, brother, his neighbor, and a friend. Their testimony largely centered on the existence of a common-law marriage. Father's brother also discussed his knowledge of disagreements between Mother and Father about money. Two police officers testified about Mother's statements referring to Father as her husband. The district court judge took judicial notice of several other cases in the district court involving Father and Mother.

After the testimony concluded on the second day, the district court judge took a recess and about 30 minutes later came back and announced his decision from the bench. He terminated Father's parental rights. The district court judge explained that while Mother lived with Father, he provided at least housing for a couple of months, so she did not have to pay rent. Yet during the months after Mother moved out, the only financial support to consider was the $800 payment for the Ford. The judge then explained that the statutory language specifies that support is to be sustained over the six months. Also, the district court judge stated that Mother bought the car, and the money Father gave her was subsequently used to reimburse Mother's grandparents for the cost of another car. And in the judge's view, there was no significant support—either by a preponderance of the evidence or by the required standard of clear and convincing evidence.

The journal entry reflects that the district court judge reviewed other evidence in the record such as Mother's bank account statements, the couple's joint tax return, and text messages between Mother and Father. The district court judge noted having presided over prior matters involving both Mother and Father and considered those proceedings, including related protection from abuse cases and Father's divorce action.

4

Father filed several additional posttrial motions including a motion to alter or amend and request for a new judge, which was denied. He followed this with a motion for dismissal and immediate care, custody, and control; "Contested Journal Entry"; motion for summary judgment; and a motion for admission of additional evidence in summary judgment. Father also submitted several screenshots of his text conversations with Mother and S.B. This did not change the order of termination.

Father timely appealed.

After this appeal was filed, Father filed a pro se motion to remove counsel, who had already filed appellant's brief, and a pro se response to the appellee's brief, which the Appellate Clerk's Office placed on hold. Father's motion to remove counsel was considered by this court and granted. Father did not request substitute counsel. This court ordered that the brief filed by appellate counsel would remain in place and that the hold would be removed from the responsive brief submitted by Father and it was filed into the case as a reply brief. In February 2026, Adoptive Parents moved to strike Father's reply brief, which this court denied.

ANALYSIS

I.  CLEAR AND CONVINCING EVIDENCE SUPPORTS THE DISTRICT COURT'S FINDINGS IN TERMINATING FATHER'S PARENTAL RIGHTS

Father argues the district court erred when it terminated his parental rights to Baby Boy B.

*Whether the biological parents were married or not is irrelevant.*

Father spent a lot of time in the termination hearing in the district court and a significant portion of his appellant briefing arguing that Mother and Father were common-law married and any conflicting evidence by Mother shows her to be untrustworthy. Although the district court heard evidence regarding whether Mother and Father were common-law married in the separate divorce proceeding, it never reached a decision one way or the other in this case. It made no findings regarding Mother's credibility as it related to whether she held herself out as married to Father. That is because the district court correctly found the existence of a common-law marriage irrelevant to its consideration of whether Father's parental rights should be terminated. That position is legally sound. The statute does not distinguish between married and unmarried fathers. See K.S.A. 59-2136(a), (h)(1)(D). The specific provision at issue here also makes no mention of marital status being considered when terminating a parent's rights. A statute that distinguishes between married and unmarried fathers is "inescapably contrary to the Equal Protection Clause." See *Stanley v. Illinois*, 405 U.S. 645, 658, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972).

*Father provided only incidental support in the six months prior to the birth of the child.*

The district court terminated Father's parental rights, specifically under K.S.A. 59-2136(h)(1)(D), which states that after parentage is determined:

"[T]he court may order that parental rights be terminated and find the consent or relinquishment unnecessary, upon a finding by clear and convincing evidence, of any of the following:

. . . .

6

"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth."

When a district court terminates parental rights based on factual findings made under K.S.A. 59-2136(h)(1), those factual findings will be reviewed on appeal to determine whether, after viewing all of the evidence in the light most favorable to the prevailing party, the findings were supported by clear and convincing evidence. See *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). Clear and convincing evidence is evidence that is sufficient to establish the truth of the facts asserted is highly probable. In making this determination, an appellate court will "not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

*This is not a divorce proceeding.*

We pause to note that this case is an adoption proceeding with an accompanying request for termination of nonconsenting Father's parental rights, not a divorce proceeding. That said, the record shows that, in the divorce proceedings, the district court set a hearing to determine whether a common-law marriage existed because Mother denied being married at that point. Nothing in the record establishes that the court made a definitive finding on that issue, much less considered perjury. In other words, absent a definitive determination that Mother was married, this court cannot conclude that she lied about it. Mother's marital status is not an issue before us in this appeal and the district court properly found it to be irrelevant. Father had an opportunity to rebut the evidence presented regarding his financial support of Mother and unfortunately failed to do so due to his hyper focus on whether a marriage existed.

7

Moreover, the district court's findings did not rest solely on Mother's testimony. The court relied on multiple witnesses, documentary evidence, and the presiding judge's familiarity with the parties through prior, intertwined proceedings. Even if the district court had relied primarily on Mother's testimony, credibility determinations are reserved for the factfinder. Because the district court directly observed the witnesses, it is better positioned to assess credibility.

*The law related to termination of parental rights in an adoption proceeding is examined.*

The United States Constitution's Due Process Clause provides substantive protection for parents when they have assumed parental duties. But when parents have not accepted some measure of responsibility for their child's future, the Constitution will not protect the parent's mere biological relationship with the child. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1060, 190 P.3d 245 (2008).

The Kansas and United States Supreme Courts have made it clear that the various statutory standards for terminating parental rights are to test whether the birth father should be permitted to interfere with the birth mother's decision to place the child for adoption. *Lehr v. Robertson*, 463 U.S. 248, 263-68, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983); *Caban v. Mohammed*, 441 U.S. 380, 391-94, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979); *In re Adoption of Baby Boy L.*, 231 Kan. 199, 216-17, 643 P.2d 168 (1982), *overruled on other grounds by In re A.J.S.*, 288 Kan. 429, 204 P.3d 543 (2009).

In determining whether a nonconsenting father failed, without reasonable cause, to support the mother during the last six months of her pregnancy, the court must consider all relevant surrounding circumstances. K.S.A. 59-2136(h)(2)(A); *In re Adoption of Baby Boy B.*, 254 Kan. 454, Syl. ¶ 4, 866 P.2d 1029 (1994). The court must determine whether the natural father took the available opportunities and options to fulfill his duties to the

best of his ability. 254 Kan. at 463. If the mother refuses assistance offered by the father, the court may take that into consideration when determining whether the father provided support to the mother. 254 Kan. at 465.

A father "must act affirmatively during the mother's pregnancy to protect his rights to the child." *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 666, 29 P.3d 466 (2001). The father need not provide total support for the mother during the last six months of pregnancy, but the father's support must be consequential and reasonable given the circumstances. General offers of support are not enough to satisfy the father's duty of support. *In re Adoption of Baby Girl G.*, No. 121,051, 2019 WL 6223121, at *6 (Kan. App. 2019) (unpublished opinion), *aff'd* 311 Kan. 798, 466 P.3d 1207 (2020).

*The district court ruling is examined.*

The district court terminated Father's parental rights, solely under K.S.A. 59-2136(h)(1)(D), which allows the adoption of a child without the consent of that child's father if, after having knowledge of the pregnancy, father failed without reasonable cause to provide support for Mother during the six months prior to the child's birth. Support under K.S.A. 59-2136(h)(4) is defined as "monetary or non-monetary assistance that is reflected in specific and significant acts and sustained over the applicable period." Additionally, in making a finding whether parental rights shall be terminated, the court "may disregard incidental visitations, contacts, communications or contributions." K.S.A. 59-2136(h)(2)(B).

In its order terminating Father's rights, the district court ruled:

> "[W]hatever support Father provided while Mother lived with him, the uncontroverted testimony presented at trial demonstrated by clear and convincing evidence a total lack of monetary support by Father, even a declaration by Father that he had no financial

responsibility for the woman carrying his child after she left his residence upon his demand. Clearly, any support Father did provide during the last six months of the pregnancy was not sustained during the last four months of the pregnancy. Even though Mother left during the six-month period upon Father's demand, his obligation continued after her departure.

"The non-monetary support admitted by Petitioners' witnesses of offers to fix the car Father wanted to buy back is not specific and significant, but rather incidental support. Therefore, Mother could reasonably have no expectation of Father's support for the child after the birth."

So, next we examine whether there was clear and convincing evidence to support the district court's decision.

### *Time frame—six months*

The relevant time period is the six-month time frame before Baby Boy B.'s birth on November 20, 2024, which includes May to November 2024. It is undisputed that Father knew of the pregnancy as of March 26, 2024, as evidenced by Mother's testimony and Father's text messages referencing the expected child. Thus, Father was aware of the imminent birth for the entire six-month period at issue.

### *Monetary support*

During the applicable time, Father argues that the monetary support he provided for Mother was by allowing her to stay in his house for over two months and surrendering the vehicle that they owned for her sole use for an additional month after she moved out. Those are the only claims he makes regarding monetary support, and he views them as sufficient to defeat any claim under K.S.A. 59-2136(h)(1)(D).

It is undisputed that Mother lived in the home with Father from January to July 2024. Mother moved out on July 15, 2024. This amounts to Father potentially providing housing for two of the six months at issue. Yet the record reflects that while Mother lived with Father, she contributed significantly to the household expenses, including utilities and related costs. Mother's bank statements show payments to a vendor for the internet bill. Generally, Mother purchased groceries for the household, using her food assistance benefits to do so. Father routinely used Mother's debit card to make purchases for her, himself, and for the household. Father's brother corroborated Mother's statements that Father used her debit card for anything she needed. Another example of Mother covering household costs is evidenced by the screenshots of texts submitted by Father showing that Mother gave him $100 for gas and a shower repair, which he also suggested was in return for him cleaning up after Mother.

Additional screenshots of text conversations with Mother suggest that Father expected Mother to pay rent and put bills in her name or she would need to find her own place to stay. Other screenshots of text messages indicate that Father claimed Mother owed him money. S.B. testified that Father claimed Mother was indebted to him from years before.

After Mother moved out, Father also did not provide any monetary support for Mother to obtain housing. The record shows that Father texted Mother that he had no intention of helping her if she left him. In a July 26, 2024 message, he stated, "She left me which means I am not responsible for her financially." Father does not rebut any of the evidence presented at trial, nor does he provide proof that he contributed any monetary support towards Mother's housing.

In *In re Adoption of Baby Girl G.*, 311 Kan. at 806-07, the court found the father's nonfinancial support—occasional rides, attending some classes and medical appointments, and encouraging texts—was inconsistent and of little value to the mother.

11

His financial support during the applicable period totaled less than $200. While he relied on text messages to claim support, the court found them at best insignificant and at worst harmful, with no reasonable justification for his failure to provide support. 311 Kan. at 806-07. The Court of Appeals provided additional details in its opinion; father bought mother a vape pen, gave her $5 for gas, paid a phone bill, treated her to several meals, and gave her a few rides. Yet the court determined this did not constitute substantial support. *In re Adoption of Baby Girl G.*, 2019 WL 6223121, at *6.

### Transportation

Father "allowed" Mother to use the Ford for about a month after she left him, even though she had paid for it. The record also shows Father nevertheless claimed the vehicle as his. The record shows that Mother purchased the vehicle by making cash withdrawals from her bank account through an ATM and cash-back transactions at Walmart. Although the vehicle was titled in Father's name to obtain lower insurance rates, Mother paid the insurance premiums, registration, and tags. Mother's car insurance payment is confirmed by her bank statements. In a separate proceeding, Father told the court that after Mother took the car in July 2024, he planned to cancel the insurance so she would have to obtain her own coverage.

After Mother moved out, she believed that Father had taken the vehicle without her knowledge. Mother was able to retrieve the vehicle from Father a few days later after her mother, S.B., provided proof of insurance, at which point Father signed the title over to Mother. S.B. also purchased additional rims for the vehicle from Father.

Mother's grandparents eventually purchased a new vehicle for her, for which Mother was expected to repay them. Father's $800 payment for the Ford, therefore, was applied towards reimbursing the grandparents for the new vehicle purchase.

*Other costs*

Mother filed a tax return with Father as married filing jointly and paid the preparation fee, which is confirmed by a $90 debit to H&R Block in her bank records. Yet no corresponding tax refund was deposited into her account, and the refund was directed to an account that was not hers.

When S.B. contacted Father in August to collect Mother's belongings, Father claimed ownership of most items and limited what could be removed. He allowed diapers to be removed, but the record is unclear whether he permitted Mother to retrieve any other baby items intended for her other child.

Here, the record shows that while they cohabitated, Mother paid for most of her needs, if not all, plus many of Father's living expenses. Father does not dispute this or claim that he provided support. At most, Father provided housing for two months, and even that characterization is generous, as he merely offered Mother a place to stay if she paid for it herself. The monetary value of that contribution is unclear; however, Father owned the home outright. The car payment does not qualify as support because it merely reimbursed Mother for the $800 she had already paid. She received no financial benefit beyond recovering her own funds.

Father does not show a dollar of actual monetary support to Mother, and more pointedly, did not present any evidence to rebut Mother's claims of lack of support. In *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d at 670, the father bought some baby items, but they never reached the mother. The father made offers to "pay for all of the costs." 29 Kan. App. 2d at 670. But the court explained the offers were vague and not concrete and he also never sent the mother any money, "bought groceries for her, made a doctor's appointment, or provided any vitamins or maternity clothes" after they separated. 29 Kan.

App. 2d at 670. The court concluded that the father did not support the mother. 29 Kan. App. 2d at 670.

Here there is clear and convincing, unchallenged evidence that Father provided no significant monetary support during the applicable time frame.

*Nonmonetary support*

Father does not claim any nonmonetary support during the time of their cohabitation. The record reflects a somewhat rocky relationship, and could be characterized as abusive and, as Mother described, degrading. Mother emphasized that she had experienced postpartum depression from the birth of her first child, and Father's poor treatment left her feeling "the most alone [she] ever felt."

Father did not support Mother emotionally around the time she moved out either. His efforts were mostly negative and likely harmful. Father gave Mother a 30-day notice to move out of the home on July 15, 2024. The next day he filed a request for protection from abuse order against her and emphasized his desire for Mother to move out even sooner. Father's texts also showed that he refused to attend Mother's OB appointment. He also mentioned how he would block Mother from contacting him.

After Mother moved out, Father performed minor maintenance on the vehicle while Mother used it, including one instance where he changed the coolant and adjusted the broken door window. Father offered to do minor work on the vehicle, but Mother's family had already handled some of those responsibilities, which left little for Father to do. That said, those repairs concerned the same vehicle she purchased and he later purchased from her in August. Father had stated that he intended to buy the car back, suggesting that his efforts may have been motivated by his own pecuniary interest rather

14

than a desire to provide support. Father's position amounts to a post hoc attempt to manufacture a support credit for what was plainly a self-interested purchase.

Father's claim of assisting Mother to find housing consisted of Father sending S.B. one screenshot of a Facebook apartment listing and recommending another rental company as potential options for Mother's housing. S.B. texted Father and requested that he cosign for an apartment for Mother, but he declined. And even if declining was reasonable, he made clear that he would "not pay her bill if she cannot."

There is more evidence that Father sought to harm Mother. S.B. testified that she asked Father if he had contacted Mother's apartment manager trying to get her evicted from her apartment and he admitted doing so at a time when he was mad because he had "heard things."

In *In re Adoption of Baby Girl G.*, 311 Kan. at 806-07, the court found the father's nonfinancial support—occasional rides, attending some classes and medical appointments, and encouraging texts—was inconsistent and of little value to the mother. While he relied on text messages to claim support, the court found them at best insignificant and at worst harmful, with no reasonable justification for his failure to provide support.

Similarly, Father's nonmonetary support here, in the form of providing suggestions on a new apartment in text messages, were of dubious value, given her needs. Second, the housing provided should not be credited to Father when it was clear Mother paid many living expenses and bills during her stay. Father provided insignificant and inconsequential support, and at times sought to actively harm Mother.

15

*Father's inability to comply due to the PFA order that was entered, at his request, against Mother*

Father argues that the protection from abuse order that he had against Mother hindered his ability to support Mother.

But Kansas law imposes a statutory duty on fathers to support the mother during the last six months of pregnancy, and this obligation persists even when a PFA order prohibits direct contact. *In re M.R.C.*, 42 Kan. App. 2d 772, 779-80, 217 P.3d 50 (2009). The court in *In re M.R.C.* addressed parental obligations during pregnancy and considered a similar issue, where a mother had a PFA against the father. The court explained that father never attempted to modify the PFA to allow him to support her, did not attempt to open a bank account, and did not try to get money to her through friends or family. The court clarified that the PFA prevented *contact*, not support. 42 Kan. App. 2d at 779-80.

In *In re M.R.C.*, 42 Kan. App. 2d at 779, the court quoted the concurring opinion in *In re Adoption of M.D.K.*, 30 Kan. App. 2d 1176, 1178, 58 P.3d 745 (2002), written by Judge Carol A. Beier, who later became Justice Beier; her observation is equally applicable here.

> "'An unwed man who learns that his unwed sexual partner is pregnant and intends to [have the baby] has only one way to ensure he can exercise his parental rights after the birth, regardless of whether the mother intends to exercise hers: He must relinquish possession and control of a part of his property or income to the [mother] during the last 6 months of the pregnancy so that she may use the items or money to support herself or prepare for the arrival of the child. He must do this regardless of whether his relationship with the [mother] continues or ends. He must do this regardless of whether the [mother] is willing to have any type of contact with him whatsoever or to submit to his emotional or physical control in any way. . . .

16

"'Even in the most acrimonious of situations, a [father] can fund a bank account in the [mother's] name. He can have property or money delivered to the [mother] by a neutral third party. He can—and must—be as creative as necessary in providing material assistance to the [mother] during the pregnancy and, the law thus assumes, to the child once it is born. He must not be deterred by the [mother's] lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant.' 30 Kan. App. 2d at 1182-83." 42 Kan. App. 2d at 779.

Here, Mother did not have a PFA against Father, which naturally requires less effort on Father's part as opposed to if it were the other way around. And despite Father's PFA against Mother, the record showed he still maintained contact with S.B., which seemed amicable and efficient. It was clear Mother and S.B. maintained contact, so S.B. was one avenue available for Father to deliver monetary support to Mother. S.B. asked Father to remove the PFA, but Father did not and attempted to get Mother to meet him, which would violate the PFA and subject Mother to adverse legal consequences. At one point Father left Mother's social security card in the Ford while she was living in the hotel. Because Father had a PFA against Mother, and considering the purpose of a PFA, this occurrence demonstrated that he could have still left money in Mother's car and it would not have endangered him.

Father met S.B. in person to purchase the Ford and he also knew S.B.'s address so he could have delivered monetary support via postal mail or drop-off. Father texted that he knew of Mother's new address when a bank statement went to his address which contained her change of address. This also shows that Father knew where Mother banked, and because he had opened the statement, he likely knew her account number, which he could have deposited money into.

17

*Conclusion*

Father had an opportunity to support Mother by either cosigning for an apartment or contributing to the cost of her apartment, yet Father refused to take part in this opportunity to support Mother, nor did he offer any money. After Mother found an apartment, Father called her apartment manager to try to get her evicted.

Any claim that Father could not financially support Mother because of his limited income is not compatible with his texts stating, "I can find money quick that's not an issue." And he did—to purchase the Ford and to subsequently hire an attorney for his divorce proceeding. This conduct confirms that Father acted resourcefully to serve his own wants or needs, but not to support the woman carrying his child, a pattern consistent with his behavior during the brief period of cohabitation. In a text to S.B., Father also stated he intended to move out of town or even the state before Baby Boy B.'s birth, further demonstrating that Mother could not reasonably expect him to provide support or be involved after childbirth. The record does not show Father had reasonable cause justifying his failure to support Mother.

The district court's findings were supported by clear and convincing evidence when viewed in the light most favorable to the prevailing party, the Adoptive Parents.

II.    FATHER'S PRO SE APPELLATE REPLY BRIEF IS NONCOMPLIANT WITH COURT RULES AND CASELAW

We begin by noting that pro se litigants' court submissions are to be construed liberally; however, a pro se litigant is still required to follow the same rules of procedure which are binding upon litigants who are represented by counsel. They cannot be given either an advantage or a disadvantage solely because of proceeding pro se. *Joritz v. University of Kansas*, 61 Kan. App. 2d 482, Syl. ¶ 2, 505 P.3d 775 (2022).

Even though we liberally construe pro se briefs, we cannot encourage one that totally ignores court rules and caselaw. And we do not consider issues raised for the first time in a reply brief. But here, due to the fact that he elected to proceed pro se after reading his appointed counsel's opening brief, we choose to liberally construe Father's filing as a supplemental opening brief and do not hold it to the general reply brief rule. See Supreme Court Rule 6.05 (2026 Kan. S. Ct. R. at 37); see also *Schutt v. Foster*, 320 Kan. 852, 857, 572 P.3d 770 (2025) (the reply brief may address only new matters raised by an appellee). But that is the only rule from which we allow a deviation.

Nevertheless, Father's pro se brief contains several procedural flaws that are fatal to his claims.

To begin, for the first time on appeal, Father argues that his trial counsel denied him his right to be heard under the Fourteenth Amendment to the United States Constitution, by dissuading him from testifying. He also argues that his appellate counsel refused to include this constitutional argument in the initial brief "along with several other issues with the brief filed by the appellee."

But constitutional issues not raised before the district court cannot be raised for the first time on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). That said, appellate courts have recognized three notable exceptions to the rule, including when:

> "(1) [T]he newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the trial court may be affirmed because it was right for the wrong reason.
>
> "To satisfy the preservation rule, a party must either provide a 'pinpoint reference to the location in the record on appeal where the issue was raised and ruled on' in the district court, or '[i]f the issue was not raised below, there must be an explanation why the issue is properly before the court.' See Kansas Supreme Court Rule 6.02(a)(5) (2022 Kan.

19

S. Ct. R. at 36). A party who ignores this requirement is considered to have waived and abandoned any exception to the preservation rule. [Citations omitted.]" *In re N.E.*, 316 Kan. 391, 407-08, 516 P.3d 586 (2022).

Father does not provide any pinpoint references to any of his claims—there is not one in his entire brief. Nor does he express his reliance on any exceptions to the general rule that would allow this court to consider his newly asserted claim. Accordingly, Father has abandoned his constitutional claim by failing to pinpoint a location in the record where he raised this issue to the district court and failing to advise us which exception to the general rule would permit us to consider his constitutional argument. See *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015) (finding defendant abandoned issue because he failed to explain why appellate court should address issue for first time on appeal); Supreme Court Rule 6.02(a)(5) (2026 Kan. S. Ct. R. at 36). By failing to properly brief this claim, he has abandoned it.

Next, the balance of Father's arguments in his reply brief attack the witnesses' credibility and Father's dissatisfaction with the district court's decision. Father argues he was denied a fair trial and regards the district court's review as inadequate "given the nature of testimony, evidence or lack of, and lack of adequate representation on father's behalf, clear perjury by mother, and questionable testimony of mother's family." But this simply reiterates his factual narrative. He also points to purported inconsistencies in testimony, alleged conflicts between exhibits and testimony, and his claimed support of Mother—arguments already made by his appointed appellate counsel in the opening brief.

This hodge podge of facts and complaints suffers the same fate as the previous claim. Not only does Father fail to pinpoint to the record, but appellate practitioners are required to divide their arguments by issue with citation to the appropriate standard of review. Supreme Court Rule 6.02(a)(5) (2026 Kan. S. Ct. R. at 36). Father does neither.

"[I]t is not our duty to unearth and then address all the various arguments that [the pro se appellant] has included in impermissible places within [their] brief." *Joritz*, 61 Kan. App. 2d at 500. Accordingly, we deny all claims made in Father's reply brief as not properly presented.

Affirmed.